# 54 GOULD v. GOULD.

KINGDON GOULD and Another, as Executors, etc., of GEORGE J. GOULD, Deceased, Executor and Trustee under the Last Will and Testament and Codicils Thereto of JAY GOULD, Deceased, and Others, Plaintiffs, v. KINGDON GOULD and Another, as Executors, etc., of GEORGE J. GOULD, Deceased, Individually and as Receiver, etc., and Others, Defendants.

Supreme Court, New York County, November 10, 1925.

**Trusts** — testamentary trust — accounting by trustees — direction of will to divide into separate trusts should have been followed — will authorized retention of present securities and relieved trustees of duty to invest in legally authorized securities — investments in outside securities must be reasonably prudent investments — trustees had no power to carry out business policies of testator — trustees not authorized to carry financial burden of railroad system regardless of nature of investments — said investments in railroad system were for benefit of railroad and for personal benefit of at least two trustees — trustees are surcharged with said investments with six per cent interest with semi-annual rests — land acquired in Louisiana after will executed did not pass to executors but to heirs at law — devisees not required to elect between will and rights in real estate in Louisiana — evidence does not show that senior trustee used estate's funds to purchase securities in wife's name — senior trustee charged with interest with semi-annual rests on secret commissions returned to estate — senior trustee charged with interest on funds commingled with his own — annuity paid to one of trustees for care of minor children and taxes on home used therefor chargeable to income — expenses incurred in transfer tax proceedings chargeable to principal — expense of improvements to certain buildings chargeable to income — expense of improvements on demand by State or municipal departments chargeable to principal, except ordinary repairs — expense of improvements to enhance rental chargeable to income — money received from leasehold divided between principal and income — attorneys' fees in defending estate chargeable to principal — expenses by executors prior to time when trusts should have been set up are chargeable to principal — expenses thereafter are chargeable to income — compensation of executors for first year is chargeable to principal, thereafter to income — trustees not chargeable with losses arising from holding securities too long — extraordinary dividends apportioned — apportionment of income of bonds purchased at premium — legacies not enumerated were illegally paid — all trustees taking active part are liable for known illegal acts of others — life tenant not estopped by mere knowledge of wrongdoing — active participation by life tenant estops him — receipt of quarterly statements did not estop life tenant — life tenant not chargeable as trustee de son tort — resignation of trustee accepted.

Under a will creating separate trusts, with direction to the executors to establish said trusts within a time specified, it is the duty of the executors to comply with the provisions of the will, but in this proceeding for an accounting it

cannot be determined that the failure of the executors to establish separate trusts was more than a contributing cause for the losses complained of by the objectants.

Under the will which directed and authorized the executors and trustees to retain the investments made by the testator and empowered them to make other investments outside of the investments legally authorized by law, the executors were bound to exercise good faith and reasonable care in the making of investments and if they failed to comply with the demands of the law in that respect they are chargeable with the losses sustained.

Notwithstanding the will gave the executors discretion in the making of investments, it nowhere authorized them to continue the business policies of the testator who, at the time of his death, was engaged in the construction of a great railroad system, and, therefore, the trustees acted improperly in investing trust funds in securities of said railroad, which were of doubtful validity and of a speculative nature, and in advancing money to the railroad and generally in using the trust funds, not for the benefit of the beneficiaries, but for the benefit of the railroad system and for the direct and personal benefit of at least two of the trustees who received large personal profits therefrom.

The investment by the trustees in said securities and the advances made by them for the benefit of the railroad system being illegal and beyond the powers of the trustees, they are surcharged with the amount of the investments with six per cent interest with semi-annual rests.

Certain land located in Louisiana which testator acquired after the execution of the first codicil to his will and which, under the laws of Louisiana he did not have the power to devise except as to one-third thereof, did not pass to the executors as part of the residuary estate of the testator and, therefore, the children of the testator took title to said land as heirs at law, not in hostility to the will but entirely outside of it, and they were not, therefore, required to elect between their rights as heirs at law to the land in question and their rights under the will.

The evidence does not establish that the senior trustee used funds of the estate to purchase securities in the name of his wife.

The senior trustee who accepted secret commissions on the sale of shares of stock owned by the estate, which commissions he has returned to the trust fund, is chargeable with interest thereon at six per cent with semi-annual rests.

He is chargeable also with interest at the same rate with semi-annual rests on all trust funds commingled by him with his personal funds.

An annuity of $6,000 per month payable to one of the trustees for the purpose of providing a home for infant children, and the taxes on a residence, the use of which was given to said trustee for the same purpose, are chargeable to the income and not to the principal of the trust fund.

Moneys paid in connection with fixing the value of the property of the estate for transfer tax purposes and in connection with its proposed sale, are properly chargeable to principal.

The expenses incurred during the administration of the trust estate are chargeable to income and not to principal.

All expenses for improvements and alterations in certain buildings belonging to the estate should be charged to income, except money paid out in the making of improvements or alterations of a permanent character ordered by municipal or State departments, and as to those items, the expense thereof should be apportioned equally between income and principal, but the expense of ordinary repairs, even though they may have been required by compulsory order, are chargeable to income.

The expense of all improvements and alterations not made to preserve the property but to enhance the rental value thereof, is properly chargeable to income.

Rents received from a leasehold which was a part of the capital of the estate should be divided between capital and income, apportioning to the income five per cent of the value thereof, and the balance of the rent to principal.

Attorneys' fees incurred in a dower action should be charged to the principal of the trust fund, although the trustees were not parties to the action, since it appears that if the claim for dower had been successful, the real property held by the trustees would have been affected, and likewise attorneys' fees paid out not only to punish a wrongdoer, but to discourage other attempts to disturb the title of the trustees to the trust fund, were properly paid by the trustees.

Legal expenses incurred by the executors in the performance of their duties prior to the time when the separate trust funds should have been set up are chargeable to the principal of the fund, but all current and incidental expenses thereafter incurred are chargeable to income.

Compensation directed by the will to be paid to the executors and trustees yearly should be charged to the principal of the estate for the first year and thereafter to income.

The trustees are not chargeable with losses sustained through the undue retention of securities held by the testator at the time of his death, in the absence of any evidence of bad faith, for the will authorized the executors and trustees to retain securities so held.

Extraordinary stock dividends on securities held by the trustees are apportioned to the income in so far as they do not encroach upon the principal of the fund.

The income of bonds which were purchased at a premium must be so apportioned between income and principal that at maturity of the bonds the premium shall have been paid into the principal and thereby the principal fund left intact.

The payment of certain so-called legacies not enumerated in the will or codicils was improper, and the executors and trustees are chargeable therewith.

The claim that one of the trustees should be relieved from all or some of the responsibility attaching to the other trustees cannot be sustained, since it appears that she was very active in the management of the trust fund and gave her active support to the policies adopted and carried out by all of the trustees, but she is not responsible for secret profits made by the senior trustee.

A life tenant who was a minor at the time of the testator's death but who, for purposes of the trust administration was permitted and authorized to countersign checks drawn by the trustees, was not, by his act in countersigning the checks, estopped from claiming that the action of the trustees was illegal, for his act in countersigning the checks was merely ministerial or clerical and in order to establish a ratification or estoppel it must be shown that the ratification was made with full knowledge of all material particulars and circumstances, and that the person who is charged with estoppel knew the effect of the acts ratified and his legal rights in the matter.

But said life tenant is estopped as to a certain loan made by the trustees on the reorganization of a company whose stock was held in the trust fund, for it appears that he took an active part in that transaction and strongly recommended and advised the trustees to make the loan.

The receipt of quarterly statements by the life tenants did not estop them from claiming that the acts of the trustees in the management of the estate were illegal.

The contention that said life tenant who was authorized to countersign checks and who participated in the unauthorized loan should be charged as a trustee *de son tort* is without evidence to support it.

The application of one of the trustees for leave to resign should be granted for the recent appointment of corporate trustees gives the beneficiaries all the necessary protection.

ACTION for the judicial settlement of the accounts of the executors and trustees of the estate of Jay Gould, deceased.

*Taylor, Knowles & Hack* [*David H. Taylor, Robert B. Knowles* and *Otto A. Hack* of counsel], for the plaintiff and for defendant The Equitable Trust Company of New York, as substituted trustee for Howard Gould and remaindermen.

*Pierce & Greer* [*F. C. Nicodemus, Jr.,* of counsel], for the defendant Frank M. Gould.

*Alton B. Parker,* for Edwin Gould, individually and as executor and trustee.

*Leonard & Walker* [*Samuel Seabury* and *Walter B. Walker* of counsel], for the defendant Frank Jay Gould.

*O'Brien, Boardman, Parker & Fox* [*Lyttleton Fox* of counsel], for the defendant Helen G. Shepard, individually and as executrix and trustee of the will and codicils of Jay Gould, deceased.

*Coudert Brothers* [*Howard Thayer Kingsbury* of counsel], for the defendant Duchesse de Talleyrand.

*Griffiths & Content* [*Harold A. Content* of counsel], for the defendant Jay Gould.

*Chadbourne, Stanchfield & Levy* [*J. Arthur Leve* and *William Wallace, Jr.,* of counsel], for the defendant George J. Gould, Jr., and for Schuyler Neilson Rice and Kingdon Gould, as executors of George J. Gould, deceased, appearing specially and solely herein for the purpose of objecting to the jurisdiction of the court over such executors.

*W. A. W. Stewart,* guardian *ad litem,* for the defendants Gloria Gould and others.

*Hughes, Rounds, Schurman & Dwight* [*George W. Schurman* of counsel], for the defendant Dorothy Gould.

*Malcolm Sumner,* guardian *ad litem* [*Bernard Naumberg* of counsel], for the defendants Jay Gould, Jr., and others.

*Thomas F. Keogh,* guardian *ad litem* [*David L. Weil* of counsel], for the defendants Jane Sinclair Gould and others.

*Geller, Rolston & Blanc* [*C. Alexander Capron* and *E. M. Cameron* of counsel], for the defendant Farmers Loan and Trust Company, as substituted trustee, etc.

*Murray, Prentice & Aldrich* [*William Dean Embree* and *Archer P. Cram* of counsel], for the defendant. The Equitable Trust Company of New York, as substituted trustee for the benefit of George J. Gould and remaindermen.

*Cravath, Henderson & DeGersdorff* [*Charles A. Robert* and *Thomas Stokes* of counsel], for Marjorie G. Drexel and another.

*DeForest Brothers* [*Henry L. DeForest* of counsel], for the plaintiffs and for defendant The Equitable Trust Company of New York, as substituted trustee for Howard Gould and remaindermen.

*Gillespie & O'Connor* [*George J. Gillespie* of counsel], for the defendant Kingdon Gould and for Schuyler Neilson Rice and Kingdon Gould, as executors of George J. Gould, deceased, appearing specially and solely herein for the purpose of objecting to the jurisdiction of the court over such executors.

*William Nelson Cromwell*, guardian *ad litem* [*P. L. Miller* of counsel], for Jason Honore de Castellane and others.

*Sullivan & Cromwell* [*P. L. Miller* of counsel], for the defendants Marie Louis de Castellane and another.

*Stotesbury & Miner* [*Louis W. Stotesbury* and *Mr. Pell* of counsel], for the defendants Commercial Trust Company of New Jersey and Schuyler N. Rice, as trustees for Jay Gould under a deed of trust dated October 19, 1922, and as trustee for Edith Gould Wainwright, under a deed of trust dated October 31, 1922, and another.

*Davis, Polk, Wardwell, Gardiner & Reed* [*John W. Davis* and *R. S. Coutant* of counsel], for Schuyler Neilson Rice and Kingdon Gould, as executors of George J. Gould, deceased, appearing specially and solely herein for the purpose of objecting to the jurisdiction of the court over such executors.

*Robert L. Luce* [*Philip E. Donlin* of counsel], for John J. O'Connor, guardian *ad litem*, for the defendants Sylvia Annunziata Gould and another, and as guardian for defendant Gioia Bishop.

*George L. Shearer*, for the defendant United States Trust Company of New York, as substituted trustee, etc., of Jay Gould, deceased, for benefit of Frank J. Gould and remaindermen.

JAMES A. O'GORMAN, Referee. The objections filed on behalf of the beneficiaries involve charges of violations of fiduciary duty, unauthorized and improvident investments, commingling of trust funds with individual funds, charging principal with payments payable from income, the acceptance and retention by certain of the trustees of underwriting syndicate profits and other secret commissions in connection with trust transactions, and the use of trust funds in railroad enterprises, in which the trustees, or some of them, had large personal interests.

The testator died in the city of New York on December 2, 1892, leaving him surviving six children, four of whom, George, Edwin, Helen and Howard, were over age, and two of whom, Frank and Anna, were under age. His will was admitted to probate by the surrogate of the county of New York, and letters testamentary issued on January 13, 1893, to his four adult children. At this time George, the oldest child, was twenty-eight years of age. The estate was inventoried at $84,000,000, not including certain lands in Louisiana, title to which vested in the six children as heirs at law, and upon which they subsequently realized $12,000,000. After making numerous bequests, including one of $5,000,000 to his son George, and one of $500,000 to his grandson, Jay Gould, a son of George, the testator gave his residuary estate to his executors, in trust, to hold or sell the same whenever in their discretion they deemed it advisable, and to divide the same into six equal shares, one of which shares to be held, designated and invested for each of his children; to apply the income of each share to the child for whose benefit the same shall be set apart, and, upon the death of such child, to transfer the principal of such share to his or her issue in such proportions and at such times as he or she shall appoint in and by his or her last will and testament, and, in case of failure to make such testamentary appointment, then to his or her issue in the proportions provided by the laws of this State in cases of intestacy; and, in the event of any child dying without issue, the principal of such share to pass to the surviving children of the testator, and the issue of any deceased child, *per stirpes* and not *per capita;* that all securities in which said trust funds shall be invested shall be held by the trustees for the parties respectively for whose benefit the funds are severally set apart; that the shares and the accounts and the transactions pertaining thereto shall at all times be kept separate and distinct, and shall never be mixed or mingled; that in the event of differences of opinion among the executors or trustees as to the holding or making of investments, or the management of the estate, the decision of three out of four shall be conclusive, and if at any time the number of executors and trustees shall be reduced to less than four, the decision of a majority of them shall be conclusive; that none of the persons named as trustees shall be trustee of the trust fund set apart for his or her benefit; that no executor or trustee shall be held responsible or liable for or charged with any loss or depreciation that may arise by holding any of the securities left by the testator, or which may be employed in setting up the separate trust funds; that his executors and trustees shall make investments of trust funds in securities other than those in which trustees are by law authorized to invest, as

they may think proper; that the shares of any railway or other incorporated companies shall always be voted at all corporate meetings as a unit, and in case his executors and trustees do not concur as to how said stock shall be voted, then the judgment of his son George shall control, and he is authorized to vote said shares in such manner as his judgment shall dictate.

The first objection relates to the neglect of the executors and trustees to divide the estate and set up the six separate trusts as directed by the testator.

Although it was the primary duty of the executors and trustees to carry out the instructions of the trust instrument, the direction to set up the six separate trust funds was disregarded for thirty years and was not complied with until after the commencement of this action. At first the pendency of a litigation affecting the estate was given as an excuse for the delay, but when that action was finally disposed of, and it imposed no liability upon the estate, George advised his cotrustees that it was not necessary to divide the estate and establish the separate trust funds and that it would be more convenient in the management of the estate to retain the estate property in a single fund. Edwin and Helen expressed the opinion that the trustees were required to divide the estate into six separate trust funds within a reasonable time, but finally yielded their views to the judgment of George. In thus disregarding the explicit testamentary directions the trustees substituted their own will for the will of the testator. In ordinary course, the executors should have accounted in the Surrogate's Court one year after the grant of letters testamentary and a sufficient sum, with the court's approval, could have been retained by the executors to meet any outstanding claims, and the residue of the estate should at once have been divided into six equal shares as required by the will.

It is claimed that this improper action on the part of the executors and trustees and the retention of the estate funds *in solido* facilitated the use of the property of the estate in a manner not authorized or contemplated by the testator. It is not clear, however, that the same course would not have been pursued even if the separate trust funds had been created, and while the action of the trustees was in violation of their duty it cannot be determined at this time that their conduct was more than a contributing cause to the losses complained of.

The main objections center around the use of trust funds in connection with the Missouri Pacific railroad and allied railroads, which comprised the group of railways known generally as the " Gould or Southwestern System," in the management of which the testator was actively engaged for several years previous to

his death. When the testator died a large part of his estate consisted of investments in this railroad system. The investments now challenged by the objectants were made by the trustees in pursuance of a plan adopted by them to give financial support to the Missouri Pacific railroad, with a view of promoting its extensions and development, insuring control of the system in the Gould family and meeting competitive conditions created by rival railroad enterprises. Pursuant to this plan, the trustees loaned, without security, upwards of $50,000,000 to this railroad system. They discharged debts of the railroads to the estate by the acceptance of railway securities of speculative value, charged out against the railways as new loans their past due coupons and overdue interest on loans, shifted investments from prior to junior liens, from bonds to stock, in some instances making the estate a participant in stock pools and syndicate underwritings, and practically made the estate a banker for railroad corporations that undertook to build new railroads. Large sums of money were invested in the purchase of common stock of railroads that had never paid a dividend, trust funds were used in the exchange and purchase of defaulted securities and loans were made to railroads to pay underwriting commissions, in which certain of the trustees participated.

It is not deemed necessary to review the evidence regarding these transactions, as counsel for the trustees seem to recognize that they cannot be approved if they are to be tested by the principles applicable to ordinary investment trusts.

In justification of these investments, the trustees claim that they acted within the broad discretionary powers of the will; that under its provisions they were authorized to carry on the testator's business and continue the railroad policies and activities in which the testator was engaged at the time of his death; that it was the testamentary purpose to put the trustees in his own place in the management and development of his railroad properties, in the hope of further constructive work by them along the line of his own plan and ambition; that the propriety of the disputed investments is not to be tested by the principles governing ordinary trust investments but by the needs of the business operations directed to be carried on under the will; that although the trust funds so employed were at the hazard of these enterprises, the investments were, nevertheless, proper and necessary for the protection and conservation of the testator's property, and, having been " made in good faith, they are within the express powers of the will."

A careful examination of that instrument, however, discloses no such power, either explicitly or by reasonable implication. The

only discretionary powers conferred upon the trustees were (1) to retain the securities of the testator without liability for possible depreciation, as a result of undue retention, and (2) to make such investments and reinvestments of the trust moneys in securities other than those in which trustees were authorized to invest by law, in the absence of testamentary discretion, as they may think proper.

But authorizing a trustee to make such investments as he may think proper does not confer an unlimited power in the use of the trust property. The discretion cannot be used arbitrarily according to the whim, caprice or personal interest of the trustee. He must use good faith and reasonable prudence in exercising his discretion. Although the will did not confine the trustees to so-called legal investments, the trustees, nevertheless, were confined to investments, and were not authorized to conduct a business or to finance railroads or to speculate in future values of railroad properties. Even where a trustee is acting under a discretionary power, such as was conferred in this will, he owes an undivided duty to the estate, and must act in the most scrupulous good faith for the benefit of the beneficiaries, uninfluenced by other considerations. (*Pyle* v. *Pyle*, 137 App. Div. 568; *Carrier* v. *Carrier*, 226 N. Y. 114.) The trustee owes the beneficiary the duty of excluding all private interests and of conducting the trust to the sole advantage of the *cestui que trust.* In the performance of this duty he must refrain from doing any act in the administration of the estate which will or may result in profit to himself. He cannot take any step which will or may result in his own enrichment or the advancement of his own interest. The object of the rule is to prevent secret frauds by removing all inducements to attempt them. (*Fulton* v. *Whitney*, 66 N. Y. 548; *Munson* v. *S., G. & C. R. R. Co.*, 103 id. 58.)

In *Carrier* v. *Carrier* (*supra*) the discretion of the trustee was to be " absolute and uncontrolled," but, as the court said: " That does not mean, however, that it might be recklessly or willfully abused. He had made himself a trustee; and in so doing he had subjected himself to those obligations of fidelity and diligence that attach to the office of trustee. He had power to ' invest ' the moneys committed to his care. He had no power, under cover of an investment, to loan them to himself. His discretion, however broad, did not relieve him from obedience to the great principles of equity which are the life of every trust."

In *Matter of Hall* (164 N. Y. 196) the court held that a discretionary power in the making of investments by a trustee does not authorize investments in new, speculative or hazardous ventures, and, as stated by the court: " If the trustees had invested in the

stock of a railroad, manufacturing, banking, or even business corporation, which, by its successful conduct for a long period of time, had achieved a standing in commercial circles and acquired the confidence of investors, their conduct would have been justified, although the investment proved unfortunate. But the distinction between such an investment and the one before us is very marked. Surely there is a mean between a government bond and the stock of an Alaska gold mine, and the fact that a trustee is not limited to the one does not authorize him to invest in the other."

The intention of a testator to confer upon his executors or trustees power to continue a business must be found in the direct, explicit and unequivocal language of the will, or else it will not be deemed to have been conferred. (*Willis* v. *Sharp*, 113 N. Y. 586.) In the absence of such a power, the executor or trustee proceeds at his peril. If the testator intended to confer the broad powers which the trustees have been exercising he would naturally have used appropriate words indicating such a purpose. His will was not hastily drawn. It was executed several years before his death and bears evidence of careful preparation. He also made three codicils, but he nowhere gave the executors and trustees the power they now assert. The claim that the trustees were to continue the railroad business or activities of the testator is entirely inconsistent with the elaborate plan of the testator for the division of the residue of his estate into six separate trust funds, with the various safeguards which he provided for their protection and security. The discretionary powers of the trustees were not enlarged by the 9th clause of the second codicil made ten days before the testator's death. The only power conferred by that clause is the direction that George shall determine how the stock held by the estate shall be voted at stockholders' meetings, if there be a difference of opinion among the trustees. As a reason for this direction the testator states: " The better to protect and conserve the values of my properties, it is my desire and I so direct and provide that the shares of any railroad or other incorporated companies at any time held by my executors or trustees, or my said trustees, shall always be voted by them or by their proxies at all corporate meetings as a unit, and in case my said executors and trustees, or my said trustees, do not concur as to how said stock shall be voted, then in view of the fact that my son George J. Gould has for years had the management of said properties, and is familiar therewith and with other like properties, I direct and provide that in such event his judgment shall control, and he is hereby authorized and empowered to vote the said shares in person or by proxy in such manner as his judgment shall dictate."

This reference by the testator to the protection and conservation of his property bears only upon the advisability of having his stock voted as a unit, and by no possible construction can it be held to be intended to increase the powers of the trustees as to investments. Stating that George may decide how stock shall be voted at a stockholders' meeting cannot carry by implication a direction to his four trustees to finance a great railroad system.

There is no language in the will permitting the inference that the testator intended that his trustees should use trust funds for the purpose of conserving, protecting and developing railroads in which he was interested at the time of his death. The testator gave no such authorization in express terms, and none can be implied from the language of the will. The will created ordinary investment trusts, subject only to the provision that the trustees were not restricted to the so-called legal trustees' securities. The will did not authorize the trustees either to continue a business, or to put new capital into any business conducted by the testator.

When the testator made his will on December 24, 1885, seven years before his death, all of his children were under age except George, who was then twenty-one years old. He named as his executrix and executors, his wife, who was then alive, Daniel S. Miller, his brother-in-law, Thomas T. Eckert, a friend and business associate, and his son George. He also named his son Edwin executor when he reached the age of twenty-one years. The sole provision regarding the investment of trust funds is contained in the will. The circumstances of his family at that time, the youth of his children, the expectation or possibility of being survived by his wife, the character of his estate, and the persons named as executrix and executors, all confirm the view that the testator intended to safeguard the future of his family by providing for investment trusts, and that he at that time intended nothing else. The claim that when he instructed his trustees to invest and reinvest his trust funds he meant that they were at liberty to carry on his railroad activities and use trust funds in railroad enterprises cannot be reconciled with the contents of the will, nor can the language employed respecting investments take on a new significance because of the subsequent change of trustees. Although the testator made three codicils thereafter, changed his trustees and empowered George to determine how shares of stock held by his estate should be voted, his directions in the will as to the investment of trust funds remained unaltered and his intention remained unchanged.

My conclusion is that the investments in connection with the Gould railroad system were not suitable or proper for trust funds and cannot be sustained as made in the exercise of a sound dis-

cretion.   They were speculative undertakings beyond the powers enumerated in the will.   None of these securities were purchased by the estate because the securities were believed to be desirable investments, but were acquired solely for the purpose of supplying the Missouri Pacific railroad system with funds which were used in part to make payments on account of the unsecured loans made by the estate.

Whether the so-called investment was an unsecured loan, or the purchase of bonds or stock, it was in every instance a transaction not for the advantage of the *cestui que trust* but for the benefit of the Missouri Pacific railroad system.   Moreover, all these investments were tainted with the self-interest of at least two of the trustees, who had large personal interests to protect, and who, as participants in underwriting syndicates, received large personal profits, and discharged, in whole or in part, their underwriting obligations by transferring to the estate securities of doubtful and speculative value, in the purchase of which trust funds should not have been used.   In every instance their personal interests were inconsistent with their duty to the beneficiaries.   The financial needs of the Missouri Pacific system were increased by the attempted development of the Missouri Pacific railroad as a coast-to-coast system, an enterprise in which George J. Gould was personally interested.   Entering upon a *quasi* joint venture to retain control of the railroad system, and to meet formidable opposition was another contributing cause to the losses complained of.   The retention of control of this railroad system was not necessary for the protection of the securities possessed by the testator at the time of his death, the larger part of which securities in these railroads then consisted of good bonds which had a ready market, and, for several years after the death of the testator, the stock could have been sold at little or no loss from the inventory values.   Whatever their motives, when trustees adopt an unauthorized course of conduct, they proceed at their own risk and peril; and, if loss ensues, they must reimburse the estate.   The trustees were instructed to make investments.   They were not empowered to engage in railroad operations or enterprises.   The principal of these six trusts was to be kept intact for the remaindermen.   The trustees were without power to expose them to the hazards of railroad ventures or of a struggle between competitors for supremacy in a railroad war.   This is not a case where in an emergency temporary aid is given to a corporation to protect the interests of an estate holding stock or other securities.   The losses here resulted from an unauthorized plan, deliberately adopted and carried out.   While the

testator in his active career was in the habit of taking the hazard of uncertain business ventures, these trustees had no right to take the same or similar business risks with the money of the estate. The primary duty of a trustee is to preserve the trust funds, make suitable investments, and procure a safe and just income therefrom.

In *Matter of Stewart* (30 App. Div. 368), relied on by the trustees, the trustees were expressly authorized to make the contested investments by the 10th clause of that will, in which the testator gave them a very general power to subscribe to any issue of capital stock of corporations necessary in their judgment or beneficial for the protection or enhancement of any interest which he held at the time of his death; and, generally, to make any subscription for stocks or bonds, or other securities, which in view of the investments held by him at his death they may think advisable. No such provision exists in the present will, and the case cited is inapplicable.

Within well-recognized principles of equity, all the investments made by the trustees to the Missouri Pacific railroad and allied corporations, now objected to must be disapproved. They were improper, improvident, speculative and tainted with the personal interest of the trustees, or some of them. The trustees are liable for all losses resulting therefrom and they must be surcharged with the amount of estate funds used in making said investments with interest at the rate of six per cent with semi-annual rests, with appropriate credits for moneys received by the estate on account of such alleged investments.

Regarding the timber lands in Louisiana, it is claimed on behalf of certain of the remaindermen that the children of Jay Gould were put to an election as between their rights as heirs at law in Louisiana and their rights as beneficiaries under the will in New York, and that in order to take under the will they were required to turn over to the trustees the proceeds of the lands in question. The estimated value of these lands at the time of the testator's death was $600,000. They were sold some years later for $12,000,000. In the meantime Anna sold to her brothers and sister her one-sixth interest therein for $100,000, which was her proportionate share based upon the value of the land when her father died.

Under the laws of Louisiana, the testator being survived by more than two children was not permitted to devise more than one-third of his real estate in that State, and upon his death his two-thirds interest in the lands of which he was then seized vested immediately in his six children as his heirs at law. As to the disposable one-third interest the trust provisions in his will were illegal and void under the laws of Louisiana. The one-third interest,

therefore, also vested in his six children upon his death, and thus they became seized of the entire fee.

The testator did not acquire these lands until after the execution of his will and the first codicil, and in view of this circumstance, coupled with the fact that he had no disposable right as to two-thirds of the property situated in that State, it is not to be presumed that he intended that these lands were to be a part of his residuary estate as provided for in his will, and under the circumstances no such intention can be imputed to him. While a will speaks from the time of the death of a testator, for purposes of construction it is always permissible to consider the conditions existing at the time of its execution. These lands were not affected by the will and did not pass to the executors and trustees by devise or otherwise. The six children as heirs took title, not in hostility to the will, but entirely outside of the will, and succeeding to these lands by operation of law was not inconsistent with the acceptance of their benefits under the will. In receiving these lands they performed no act in opposition or hostility to the will under which they were beneficiaries. No condition is annexed to the legacies or devises under the will and none is to be implied.

Contemplating the possibility of some part of his will being declared invalid, the testator provided by paragraph 14 of his will as follows:

"*Fourteenth.* Should any of the provisions or directions of this will fail, or be held ineffectual or invalid for any reason, it is my will that no other portion or provision of this will be invalidated, impaired or affected thereby, but that this will be construed as if such invalid provision or direction had not been herein contained."

This is an express declaration that all lawful provisions of his will should be carried out unaffected by any provision that may be held to be invalid, and that in any event the persons benefited by the lawful provisions shall take the benefits therein provided for them. Giving reasonable effect to this clause it excludes the suggestion of alternative benefits, or that the children must elect between accepting their rights as heirs in Louisiana or as beneficiaries under the will. The principle of equitable election has no application. (*Kearney* v. *Macomb*, 16 N. J. Eq. 189.)

The claimants invoking the doctrine of election and other equitable remedies seek to circumvent the positive laws and public policy of another State whose laws regarding real estate in its jurisdiction must be respected by the courts of this State. The title of the six children as heirs at law to these lands is a paramount title and cannot now be impeached directly or indirectly.

Regarding the Pacific Express transaction the evidence does not

establish that trust funds were used by George J. Gould in making the purchase in the name of his wife. Although he had in his hands at this time an amount of estate funds larger than the amount required for this transaction, the evidence does not clearly trace any of the trust funds into the purchase price of the stock. It may be difficult, in a complicated transaction, to trace particular funds, especially where the trustee has destroyed his private books of account, but the testimony does not support the objection, and the claim that the profits from this transaction should be credited to the estate is disallowed.

The acceptance and retention by George J. Gould of secret commissions on the sale of estate-owned shares of the Western Union Telegraph Company was in violation of his fiduciary duty; $620,401.71, the amount so retained, was paid by him to the estate eight years later, when the fact of his acceptance of the commission was ascertained. Owing to the destruction of his private books of account, and the absence of other evidence, it cannot be determined what profits he realized on the use of this money during the period that it was in his hands. The estate, however, should be credited with the legal rate of interest during this period, with semi-annual rests.

The same disposition will be made as to all other secret commissions which appear from the evidence to have been received by the trustees, or any of them.

The courts have invariably disapproved of a trustee commingling trust funds with his own, and since 1916 it has been a criminal offense in this State for a trustee to do so. (Surrogate's Court Act, § 231.) As to the trust funds commingled with George J. Gould's personal funds, he should be charged thereon with interest at the rate of six per cent per annum, with semi-annual rests.

In his second codicil the testator gave to his daughter Helen the use of his residence at Irvington, commonly called " Lyndhurst," free of taxes until his youngest child reached the age of twenty-one years, and until the happening of the same event he directed that Helen be paid $6,000 a month. While stating that no trust was intended, he declared that this payment was directed in the expectation that his minor children would during the period provided for make their home with his said daughter.

The taxes upon this property and the $6,000 per month have been charged against the principal and objection thereto is made on behalf of certain of the remaindermen. Under the general rule that taxes and carrying charges on real estate held by trustees for a life beneficiary are to be paid out of the income of the trust estate, all the contested items in connection with the " Lyndhurst "

property should be charged to the income account.    (*Spencer* v. *Spencer*, 219 N. Y. 459, 465.)

The trust estate was producing an annual income of upwards of $3,000,000, and there is no room for the inference that the testator intended that this large income should not pay such expenses as are involved in the contested charges.    The " Lyndhurst " property was not a vacant or unproductive property, and the cases bearing upon that class of property have no application.

The expenditures in 1896, as to which objection is made, should be borne by the tenant in possession.    The items of expense occurring after Frank attained his majority and before the sale should be charged to income.    The other expenditures for taxes, insurance, repairs and incidental expenses to property should be charged to income.    The expenditures in connection with fixing the value of the property for transfer tax purposes and in connection with its proposed sale, are properly chargeable to *corpus*.

In the absence of a clear and distinct expression in the will to the contrary, it is presumed that the testator intended that the principal of a trust fund should be kept intact for the remaindermen and should not be depleted by the payment from the principal of so-called current expenses incurred during the administration of the trust estate.    (*Matter of Albertson*, 113 N. Y. 434.)

The life tenant is required to preserve the premises and defray the expenses of ordinary repairs and maintenance.    (*Stevens* v. *Melcher*, 152 N. Y. 551.)

The $6,000 a month directed to be paid to Helen during her brother Frank's minority was evidently intended by the testator to cover the expense of maintaining a home for all of the children excepting George and Edwin, who were married and had their own homes.

The gift was, in its nature, an annuity and should have been charged against income and not against the principal of the trust estate.    The very nature of an annuity suggests that when those charged with the payment of it have in their hands a fund producing income sufficient to pay it, the payment should be made out of income and not from the principal.    (3 C. J. 212.)    The provision for the maintenance of a home by Helen for her unmarried brothers and sister and for the payment to her of $6,000 per month was largely a substitute for the provision originally made in the will for the maintenance of a home for the widow of the testator.    In that provision, his wife being then alive, the testator expressly directed that the taxes and the annuity to be paid to his widow should be paid from income, and while he was not equally precise in the provision made for the benefit of his daughter Helen, a few days before

his death, there is no reason to doubt that he expected the taxes on " Lyndhurst " and the annuity paid to Helen should also be paid out of income.

As to the improvements and alterations in connection with the Grand Opera House and the Park Row property, all of the expenses for such purposes should be charged to the income and not to the *corpus*, except as to compulsory improvements or alterations of a permanent character ordered by municipal or State departments, and as to such items the expenses thereof should be apportioned equally between income and *corpus*. As to ordinary repairs and maintenance, even though required by compulsory order, the same should, nevertheless, be charged to the life tenant whose duty it is to make such necessary repairs, and he cannot escape the performance of that duty by deferring its execution until some municipal or State authority compels him to do so. All of these improvements and alterations were made not to preserve the property but to enhance the rental value of the property, and should be charged to the life tenants who received the benefit. Where life tenants for the purpose of increasing their income make substantial improvements, they cannot charge the whole or, in the absence of special equities, any part of the cost upon the remaindermen who may find the improvement of little or no value when they succeed to the enjoyment of the property. (*Stevens* v. *Melcher, supra.*)

Objection is also made that the trustees improperly applied the rents derived from the leasehold on 31 Park Row, New York city. A leasehold is part of the capital of the estate. As it is but a temporary possession it cannot be treated as permanent capital. Where assets are of a wasting nature, as terminable annuities, leases and the like, the value of the asset at the time of the testator's death should be ascertained, and what should be regarded as income, computed upon that basis. If rents from a leasehold property were to be regarded as income, there would be nothing left for the remaindermen when the lease expires. If this lease had been sold by the trustees the life tenants would be entitled to the income derived from the proceeds. The lease not having been sold, the life tenants are entitled to interest at five per cent upon its value, and the balance of the rent should be credited to principal.

In the Angell dower suit the trustees were not parties, but as the claim for dower, if successful, would affect the real property held by the trustees, they were justified in employing counsel to defend the action and protect the interests of the trust estate. Considering the extent of the interests involved and the character of the controversy, the amount paid by the trustees for legal services is not open to objection. The sum should be charged to the *corpus*.

So, also, as to legal expenses incurred in connection with the Cody prosecution. This was one of the steps taken in good faith by the trustees not only to punish a wrongdoer but to discourage other attempts to disturb their title as trustees. The legal expenses were properly incurred, and the objection thereto is disallowed.

The legal expenses necessarily incurred by the executors in the performance of their duties, as executors, were properly chargeable against the gross estate received by them. Although the trust estates were not set up, as required by the terms of the will until 1922, yet in determining whether charges should be made against income or principal, the court will assume that the trust estates were established on January 13, 1894, when they should have been set up, one year after the issuance of letters testamentary. (*Lawrence* v. *Littlefield*, 215 N. Y. 561.)

All current and incidental expenses incurred after January 13, 1894, will be deemed expenses incurred by the trustees and not by the executors, and, therefore, chargeable against the income and not against the principal. The ordinary expenses of administration by an executor are payable out of principal. The ordinary expenses of administration by a trustee are payable out of income.

The compensation of $10,000 a year paid to each of the executors and trustees, excepting for the first year, should be charged against income. The amount paid for the first year should be charged against the *corpus*. The executors and trustees were not to receive the statutory compensation. Their compensation was fixed in the will and must be treated like any ordinary expense of administration.

The objection that the trustees should be charged with losses resulting from the undue holding of securities is disallowed. The will expressly exempts the trustees from all losses resulting from the undue retention of securities, and, in the absence of evidence of bad faith, they are entitled to the benefit of this immunity. It is significant in this connection that while the testator grants this immunity to his trustees against losses resulting from the holding of securities, he gives no such immunity with respect to improvident or unauthorized investments.

The Pullman stock dividends did not impair the value of the Wagner Palace Company stock as of the date of the testator's death. The Pullman Company was a successor of the Wagner Company. At the time of the reorganization, the shares of the former company were given in exchange for the shares of the latter, and, so far as the principal involved the shares of the Pullman Company, merely represented the property held by the testator at the time of his death. The objection to the receipt by the life tenants of the extraordinary dividend is disallowed.

The extra dividends paid on the Equitable Trust Company stock, although within the earnings of the current year, nevertheless worked an impairment of the value of the stock as of the time of the testator's death, and the objection thereto must be allowed. For like reason the extra dividend as to the Consolidated Coal Company should be credited to the principal account.

In the instances where bonds have been purchased at a premium there should be such a proportionate deduction from the nominal interest as will at the maturity of the bonds make good the premium paid, and thus preserve the principal fund intact. (*Matter of Stevens*, 187 N. Y. 471.)

The objections relating to the expense of maintaining the yacht *Atalanta*, the. payments to G. W. Gastlin, the acquisition of Manhattan stock in 1899 and 1903, and the alleged premature payment of legacies are disallowed.

As to the payment of so-called legacies not enumerated in the will or codicils, objection thereto having been made, the objection must be sustained.

The claim is made that Helen Gould, now Mrs. Shepard, should be relieved from all or some of the responsibility attaching to the other trustees, although it appears from the evidence that she participated generally in the management of the estate. She was not a passive trustee. She insisted upon the retention of the investment in the Manhattan Railway Company, and did so against the judgment of her brothers George and Edwin. She was a constant supporter of the estate's policy of financially supporting the Missouri Pacific system. She was a strong believer in carrying out what she regarded as her father's policies. She personally signed the checks for $7,000,000 Missouri Pacific convertible bonds acquired from the Kuhn-Loeb syndicate, and she advised large advances made in connection with the development and reorganization of the International and Great Northern Railroad Company. She was in frequent conferences with her cotrustees, and, generally, kept herself informed as to the affairs of the estate. She was at all times most scrupulous in the performance of the duties, but like her cotrustees she acted under a misconception as to the duties and responsibilities which attach to a fiduciary relation. She submits no accounting of her own, but formally approves the account of her coexecutors and trustees with a reservation. She assumed her executorial and fiduciary duties, and during all these years drew the official compensation. She impliedly promised to bring to the discharge of her duties such ability as she possessed.

Where a trustee by his negligence suffers his cotrustees to receive and waste the estate, when he has the means of preventing it by

proper care, he is liable to the beneficiaries for the estate thus wasted.    (*Adair* v. *Brimmer,* 74 N. Y. 539.)

By proper care, by a division of the estate into separate trusts, by the exercise of individual judgment and discretion on the part of each trustee, by respecting the provisions of the will and by keeping in mind that a trustee cannot take the same risks that an individual may take with his own property, the speculative and hazardous investments might and should have been avoided.    There is no proof of any protest by any one of the trustees sufficient to avoid responsibility.    A trustee's first duty is to the beneficiaries of the trust, and I can find no ground for exonerating any of the trustees from any of the general surcharges.    Under the evidence in this case, the responsibility for the surcharges must be joint and equal.    As was said by the court in *Globe Woolen Co.* v. *Utica G. & El. Co.* (224 N. Y. 483): " ' The great rule of law '    *    *    *    which holds a trustee to the duty of constant and unqualified fidelity is not a thing of forms and phrases."    So far as they permitted George to dominate the management of the estate, all the trustees assumed responsibility for his acts.

The influence which he was permitted to exercise in the affairs of the estate was not in accordance with any instruction of the testator, but was contrary to the testamentary direction.    The testator directed that in the matter of investments and reinvestments the vote of three out of four trustees should be conclusive; and it is apparent, therefore, that the testator expected each trustee to use his or her own independent judgment.    It is only with reference to voting the stock as a unit that he gave George a deciding voice in the event of a difference of opinion.    They were all responsible for the failure to divide the estate into six separate trust funds, and for all losses resulting from the mismanagement of the property of the estate.    The only exception to such joint liability is in the instances where George received and retained secret profits.

In regard to the alleged estoppel against Frank Gould, one of the life tenants, it appears that in 1895, when but seventeen or eighteen years of age, he entered the estate offices and continued there until about 1910.    The estate securities were kept in a vault, access to which could not be had by less than two trustees.    The estate funds were kept in bank accounts, checks on which had to be signed by at least two trustees for withdrawal purposes.    About the time that Frank became of age this arrangement was changed for the convenience of the trustees so that his presence would be equal to that of one trustee, for the purpose of deposit or withdrawal of securities in or from the vault, and also that his countersignature

on estate checks would be equal to that of a trustee. The vault company and the banks having estate deposits were formally notified in writing of this arrangement. The latter received Frank's signature, and thereafter recognized his countersignature on checks. While performing these functions, Frank countersigned a large number of estate checks, some of which he countersigned while he was a minor. He appears also to have conferred with his brothers and his sister regarding estate matters during these years. But he was not expected to exercise any independent judgment of his own as to the propriety of these payments or the transactions affected by them. The checks as drawn were checks of the executors and trustees of the estate. His countersigning was nothing more than an assurance that the checks were authorized by the executors and trustees. His actions were merely clerical and mechanical and cannot be regarded as a ratification. These transactions doubtless gave him some knowledge of what the trustees were doing, but under the rule declared in *Adair* v. *Brimmer (supra)*, in order to establish a ratification by a *cestui que trust* " the fact must not only be clearly proved but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances, and, also, in a case like the present, that the *cestui que trust* was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter." Under the evidence, this essential element is lacking.

But as to the $5,000,000 loaned by the estate on the reorganization of the International and Great Northern Railroad Company, Frank was an active participant in that transaction, and strongly recommended and advised the trustees to make the loan, and he is estopped from now challenging the propriety of that transaction.

The receipt of the quarterly statements and the annual statements do not constitute an estoppel either as to Frank or Anna.

The contention that Frank should be charged as a trustee *de son tort* is without evidence to support it. No estoppel has been established against any of the beneficiaries excepting Frank, and the estoppel in his case is confined to the International and Great Northern Railroad Company loan.

The application of Edwin Gould for leave to resign as trustee should be granted. The recent appointment of corporate trustees gives the beneficiaries all necessary protection.

Submit findings in accordance with these views.