In the Matter of the Estate of JOSEPHINE DEL DRAGO, Deceased.
Surrogate's Court, New York County, June 27, 1942.

384

*Ludwig M. Wilson* for Giovanni del Drago, one of executors, petitioner.

*Littleton Fox* and *Anthony J. Caputo* for Byron Clark, Jr., coexecutor, and Corn Exchange Bank and Trust Company, as trustee.

*John L. Buckley,* special guardian.

FOLEY, S. The petitioner has moved to amend and resettle a decree dated February 15, 1939, and a supplemental decree dated August 31, 1939, made in a proceeding brought by the executors for leave to improve and rehabilitate real property left by the testatrix. The motion is denied. No legal or equitable ground for the modification, amendment or resettlement of such decrees has been shown.

The petitioner is Prince Giovanni del Drago. He is a coexecutor of the estate, the husband of the testatrix, and the life tenant of the residuary trust. Extensive testimony has been taken upon the question of the existence of any of the grounds set forth in subdivision 6 of section 20 of the Surrogate's Court Act which are required to be shown to justify the opening or modification or resettlement of a decree. As the trier of the facts, the surrogate holds that no ground for even the slightest modification or

resettlement has been proved. On the contrary it has been conclusively shown that the petitioner here and his attorney, Ludwig M. Wilson, originated the plan to rehabilitate the property. As a result of their urging, del Drago induced his coexecutor to join with him in a petition to authorize the expenditure of a large sum of money from the personal property within the estate for the purpose of rehabilitating the real property which formed part of the trust created for his benefit. Six properties located in the borough of Manhattan were involved, one a business building and the others old-fashioned tenements or apartments. Approximately $120,000 was spent upon the improvements. As an inducement to his coexecutor and to the special guardian of the infant remaindermen and in order to procure the approval of the surrogate of the plan of rehabilitation, del Drago offered to contribute to the amortization of the expenses of rehabilitation out of his income. He was about seventy-eight years old at the time and, estimated upon his expectancy of life, his total contribution would have been a relatively small part of the whole cost. His motive was plainly to increase his income by the enhanced rentals which would be derived from the rehabilitated property.

The special guardian of the infant remaindermen in the original proceeding filed two carefully drawn reports based upon his thorough investigation of the situation. He suggested a modification of the original offer of del Drago to contribute by way of amortization five per cent annually of the total cost of the improvements out of the income to which he was entitled under the terms of the will and to reimburse principal to that extent. The modification consisted of a plan that the life tenant contribute ten per cent of the cost of refrigerators, gas ranges, and Venetian blinds, because of their temporary nature. The offer of del Drago to pay five per cent of the cost of all other improvements was recommended by the special guardian for approval by the court. Judicial approval was given in an original and two amending decrees. The final amending decree of August 31, 1939, ratified this modified plan and expressly directed that the fixed percentages " be charged annually against the income to which the petitioner Giovanni del Drago is entitled, pursuant to the provisions " of the residuary clause of the will. That amended decree had annexed to it an express consent over the signature of the attorney for del Drago to its entry " in conformity to the modifications recommended in and by the Special Guardian's report." Further request for the approval of the modified plan was contained in a letter submitted to the court dated January 30, 1939, and signed by the attorney for del Drago.

A careful analysis of the petition and the two supplemental petitions submitted to the surrogate in the rehabilitation proceeding, of the special guardian's reports, and the provisions of the original decree and the two amending decrees destroys the present contention of del Drago that there was any misunderstanding or mistake of law or fact in such decrees. Because of the shrinkage of rents and his failure to realize the sanguine expectations of increased income, he now seeks belatedly to repudiate his promises, to escape the payment of amortization out of his income, and to unload the entire expense upon the infant remaindermen of the trust.

After the last amending decree in the rehabilitation proceeding he and his coexecutor initiated an accounting proceeding. A supplemental account was filed in it which accurately set forth the cost of the improvements of the various properties, the amount of amortization and the respective dates from which the contributions to it out of his income were to become effective. The decree judicially settling the account and supplemental account was dated November 18, 1940. In the present motion, no attempt has been made to change its provisions and it is clear that no legal ground ever existed for modification or resettlement.

Prior to the making of that decree all of the improvements had been completed and the cost taken from principal had been paid out. The rights of the parties had become fixed. Partial recoupment and restitution to principal could only be made by del Drago's carrying out his promises to contribute by way of amortization out of the entire income to which he was entitled under the will. (A portion of the original decision of the Surrogate is omitted because not of general interest.)

The contention is made that the promised contribution by the life tenant of an annual amortization charge was void and constituted an assignment of future income prohibited by section 15 of the Personal Property Law and section 103 of the Real Property Law. That contention is baseless and is overruled. Under the law of trusts of this State, taxes and ordinary carrying charges, including the cost of repairs, are properly charged out of income and must be borne by the life tenant. (*Matter of Albertson,* 113 N. Y. 434; *Matter of Jackson,* 258 N. Y. 281, 288; *Matter of Ely,* 249 App. Div. 8, affd. 274 N. Y. 501.) The trustee in making these expenditures acts under the powers granted by the will and in accordance with well-established legal rules. He is not required to seek the approval of the life tenant. Where the consent of such life tenant is given or a plan initiated by him

is approved, as it was here, the procedure simply amounts to a confirmation of what could be legally done by the fiduciary without the participation or consent of the beneficiary. As Judge (now Chief Judge) LEHMAN pointed out in *City Bank Farmers Trust Co.* v. *Smith* (263 N. Y. 292, 295): " Consent by a beneficiary in advance may bar claim for redress, on the theory of *volenti non fit injuria,* but consent cannot enlarge nor objection limit the powers of the trustee."

Many decisions in this State have recognized the rule that where unusual or extraordinary repairs or permanent improvements to real estate are made, an apportionment of the cost between life tenant and the remaindermen shall be had.

*Stevens* v. *Melcher* (152 N. Y. 551, 569) is a leading authority on this subject. There the trustees permitted the life tenant to erect a new building on land in the city of New York. The property had been unproductive. The cost of the building amounted to $130,000. The trustees had power under the will to make the improvements " when it could be reasonably anticipated that such investment would be beneficial to the remaindermen and to the life beneficiary." There it was unnecessary to charge a part of the cost out of the income of the life tenant by way of amortization or otherwise, because the life tenant had paid the total cost out of her own funds. In the process of fixing the apportionment of the cost, the court adopted a formula determining that the value of the fee had been enhanced by the sum of $90,000 by the erection of the building. That amount was charged out of principal. The balance of the cost of the building — $40,000 — was decreed to be the contribution of and a charge against the life tenant. It should be noted that in that case an entirely new building was constructed, whereas here only alterations to existing structures were made. The method followed in *Stevens* v. *Melcher* (*supra*) of valuing the enhancement of the fee by reason of the making of the improvement has yielded to the more recent trend of the law which provides for the amortization of the cost of the improvement.

It is not even contended by the life tenant here that the alterations were wholly permanent in character. Many of the changes and installations that were made were of extremely short life and would have come within the class of ordinary repairs. For example, interior painting must be constantly redone. Linoleum installed upon the stairs and halls wears out in a few years. Venetian blinds, gas stoves, and refrigerators are required to be replaced within relatively short periods. One of the witnesses for the life tenant testified that in his opinion eighty per cent

of the improvements made were permanent in character and twenty per cent temporary. This ratio, in the opinion of the surrogate, is entirely too generous to the life tenant and is detrimental to the remaindermen.

The history of the investigation and the development of the improvements to the properties in this estate is significant on this question. There were certain violations laid by departments of the city of New York against some of the buildings. The executors procured estimates of the cost to remove these violations exclusively. The petitioner and his attorney, and the architect and real estate brokers whom he consulted, then developed a plan for more extensive improvements which went beyond the mere removal of violations. Necessarily the cost was largely increased by these widened plans. Directly connected with the increased cost of the more extensive improvements was the expectation of greatly increased rents which would be derived from the properties. If the amounts to be apportioned had been a matter for determination by the surrogate, instead of by agreement of all interested, I would necessarily have had to take into consideration the fact that the life tenant substantially benefited by this increase of rents and should have been charged a larger share of such cost because of the enhancement of his income. Such was the situation and rule applied in *Gould* v. *Gould* (126 Misc. 54) and in *Matter of Parr* (45 Misc. 564, affd. 113 App. Div. 921). The rule was also approved in *Matter of Nesmith* (140 N. Y. 609).

It was held in *Gould* v. *Gould* (*supra*) that the expense of improvements and alterations should be charged to the income and not to the *corpus* except as to compulsory improvements or alterations of a permanent character ordered by municipal or city departments, and as to such items the expense should be apportioned between income and *corpus*. " As to ordinary repairs and maintenance, even though required by compulsory order, the same should, nevertheless, be charged to the life tenant whose duty it is to make such necessary repairs, * * *. All of these improvements and alterations were made not to preserve the property but to enhance the rental value of the property, and should be charged to the life tenants who received the benefit. Where life tenants for the purpose of increasing their income make substantial improvements, they cannot charge the whole or, in the absence of special equities, any part of the cost upon the remaindermen who may find the improvement of little or no value when they succeed to the enjoyment of the property.''

In *Matter of Parr (supra)*, somewhat similar facts were considered and it was held that certain improvements were made to enhance the income, because they were primarily for the benefit of the life tenants and were of immediate and continuous benefit to them. The surrogate there held that those who receive the benefit must contribute to the cost. He stated a policy which is of special force in the pending proceeding, as follows: " But the court must be jealous of the integrity of the *corpus* of the estate and not open the door to charges against it without extreme caution, otherwise it would be the constant subject of assault at the instance of the life tenant."

If the question had been open for determination I would have found that not more than sixty per cent constituted a principal charge and at least forty per cent a proper income charge. In terms of dollars, out of a total cost of $120,000, $72,000 would be allocated to principal and $48,000 would thus be required to have been paid out of the income of the life tenant or by outright contribution by him from his personal funds.

The decrees gave recognition to the modified plan by requiring an amortization in larger annual amounts at the rate of ten per cent for the cost of certain of these installations as against five per cent per annum for the others. By the adoption of the plan proposed by the life tenant in the original rehabilitation proceeding, with the modification suggested by the special guardian, the necessity for complicated evidence on the character of the improvements and whether permanent or temporary and the length of their lives was avoided.

The modern trend favorable to the method of amortizing the cost of improvements is set forth in the Restatement of the Law of Trusts (§ 233, p. 688) : " If the improvements are not permanent in character but the probable life of the improvements is limited in duration, although the cost of the improvements is payable out of principal, the trustee is under a duty to the beneficiary entitled in remainder to amortize the cost of such improvements out of income, in accordance with such reasonable plan as he may adopt." An illustration of this rule is given. The trustee installs bathtubs and refrigerators in an apartment house at a cost of $10,000. The probable life of these improvements is ten years. The expense is chargeable to principal, but the trustee should deduct $1,000 from income each year for ten years if the life tenant lives that long.

Professor Scott in his work on " Trusts " amplifies the rule just quoted from the Restatement. He points out that where the improvements are not of a permanent nature further adjust-

ment is to be made in order to treat both life beneficiary and remainderman fairly. "In such a case the investment will be treated as a wasting investment, and the trustee is under a duty to the beneficiary who is entitled to the principal to make provision for amortization. He must deduct from the income each year enough to amortize the cost of the improvement. * * * This method of adjusting the cost between life beneficiary and remainderman is obviously the fairest method. It avoids the necessity of speculating upon the probable duration of the trust and deducting immediately a gross sum from the income for the whole period. It results in an equalization of the income from year to year instead of the deduction of a large amount all in one year " (pp. 1265, 1266).

Various decisions in this State have recognized the justice of the method of charging costs by the process of amortization. (*Matter of Nesmith, supra; Matter of Adler,* 164 Misc. 544; *Gould* v. *Gould, supra; Matter of Young,* 17 Misc. 680, mod. on another ground, 15 App. Div. 285, affd. 160 N. Y. 705; *Kirchner* v. *Kirchner,* 71 Misc. 57.)

In the light of these decisions, the contention that the life tenant has assigned his income in violation of section 15 of the Personal Property Law and section 103 of the Real Property Law must be overruled. The life tenant made no invalid assignment of income. He sought and obtained judicial approval of a plan to contribute to the amortization which was proper and lawful.

The further argument of counsel for the life tenant, that the contribution which the latter agreed to make by way of amortization constitutes invalid accumulation violative of section 16 of the Personal Property Law and section 61 of the Real Property Law, is overruled. The decision of the Court of Appeals in *Matter of Nesmith* (*supra*) completely refutes this argument. In that case a similar contention was rejected. Improvements were made by the trustee on a pier by the erection of a shed. The cost was $12,000. The trustee amortized the expense by charging the amount of the increased rent derived from the improvement against the income of the life tenant. The surrogate approved this method of amortization. The life tenants contended that the statutes against accumulation had been violated. The Court of Appeals held that the surrogate's "decree works out a perfectly just result. The erection of the shed has not diminished the earnings, nor impaired the earning capacity of the property; but, to the contrary, has increased the one and preserved the other. The persons entitled to a distribution of the earnings of the trust estate have received them undiminished,

and will continue to receive them. They are not prejudiced and, if the trust survives the period of time required to reimburse the trustee for his advances, they will be the gainers. There has been no accumulation of income. The trustee has advanced the money out of his own pocket and the increased rental, as it comes in, goes to repay him. We think that the surrogate's ruling on this question is quite unobjectionable and it was most favorable to the appellants [the life tenants].''

(Other directions included in the original decision of the Surrogate omitted because of their subordinate importance.)

Tax costs and submit decree on notice denying the application accordingly.