**Michael KOLENTUS, et al.,
Plaintiffs-Appellants,**

**v.**

**AVCO CORPORATION and Avco Precision Products Division, Avco Corporation, and Chemical Bank, Defendants-Appellees.**

No. 85–1143.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1985.

Decided Aug. 5, 1986.

Robert G. Burton, Burton & Simkin, Richmond, Ind., for plaintiffs-appellants.

Don A. Banta, Naphin, Banta & Cox, Chicago, Ill., for defendants-appellees.

Before BAUER and COFFEY, Circuit Judges, and GORDON, District Judge.*

MYRON L. GORDON, District Judge.

The plaintiffs, retirees of Avco Corporation's now-defunct Precision Products Division plant in Richmond, Indiana, brought this class action to recover certain pension benefits which they allege were wrongfully denied them as a result of the termination of four pension plans in 1974 and 1975. The district court granted partial summary judgment for the defendants, and, follow-

ing a court trial of the remaining issues, entered judgment for the defendants. We affirm.

## I. BACKGROUND

Prior to August 31, 1974, defendants Avco Corporation and its Precision Products Division (hereinafter collectively referred to as "Avco") operated a factory in Richmond, Indiana, employing approximately 500 persons, which produced home video equipment. On that date, Avco closed the plant, having lost the contract for the products manufactured there and unable to find other work for the plant.

The plaintiff class consists of former Avco workers who were members of four bargaining units at the Richmond plant: Local Union No. 1127 of the International Brotherhood of Electrical Workers (IBEW), Local Union No. 135 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters), Local Union No. 21 of the International Association of Tool Craftsmen (IATC), and Local Union No. 200 of the United Plant Guard Workers of America (Guards).

Beginning in 1957, Avco and the four bargaining units entered into a series of collective bargaining agreements, each agreement providing that pension benefits would be governed by supplemental pension agreements. These supplemental pension agreements, following their formation, were themselves amended from time to time. The Pension Plan for Hourly-Rated Employees of Avco Corporation (Hourly Plan), in turn, was incorporated in each of the supplemental pension agreements and constituted the basic pension plan. The Hourly Plan provided for the vesting of benefits upon an employee's fulfillment of certain age and length-of-service requirements.

On August 31, 1974, the day the Richmond plant closed, the IBEW, IATC and

---

* The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

Teamsters pension plans were terminated. The pension plan for the Guards was terminated on May 31, 1975. Defendant Chemical Bank (Bank) was the trustee of the pension plans at issue from their inception through the dates of their termination.

Following the plan terminations, Avco made no further contributions to the pension funds. As a result, there were insufficient assets to cover the benefits set out in the pension agreements.

The Pension Benefit Guaranty Corporation (PBGC), under the authority of 29 U.S.C. § 1342 of the Employee Retirement Income Security Act (ERISA), assumed responsibility for and was appointed trustee of the plans upon their termination. The PBGC originally was named a defendant in this action but later was dismissed upon the stipulation of the parties. There is some dispute between the present parties concerning the extent of the PBGC's coverage for plan benefits, the defendants claiming that in many cases retirees have received the same benefits from the PBGC that they would have received had the pension plans been fully funded under the terms of the supplemental agreements. The court need not delve into this dispute. The degree of PBGC coverage relates to the matter of damages and is not relevant to this appeal.

As a result of the plan terminations, the plaintiffs claim that they have been deprived of vested pension benefits to which they are entitled. In support of their claim for these benefits, the plaintiffs charge that (1) any plan provisions purporting to authorize the terminations are invalid and contrary to representations made by Avco to the plaintiffs; (2) Avco should be estopped to deny the vested benefits; (3) Avco has been unjustly enriched; (4) Avco failed to comply with the Welfare and Pension Plans Disclosure Act, 29 U.S.C. §§ 301–309 (repealed and replaced by 29 U.S.C. §§ 1021–1031, effective Jan. 1, 1975), by failing adequately to explain the plan provisions to the plaintiffs; (5) Avco did not make pension contributions in accordance with the standards of the plans'

actuary; (6) Avco acted fraudulently in failing to disclose its intention to close the Richmond plant to the union locals when negotiating and entering into the final plan agreements; and (7) Avco violated its fiduciary and contractual duty to the plaintiffs by neglecting to notify the Bank in a timely manner of the projected plant shutdown and plan terminations so that the plan assets could be protected. As to the defendant Bank, the plaintiffs contend that it violated its fiduciary and contractual obligations to the plaintiffs in the management of the pension plan assets.

## II. PREVIOUS LEGAL PROCEEDINGS

The present action originally was filed in Indiana Superior Court on November 10, 1977. Shortly thereafter, the action was removed by Avco to the United States District Court, Southern District of Indiana. Jurisdiction is predicated on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and on 28 U.S.C. § 1332.

On October 11, 1983, in response to the parties' cross-motions for summary judgment, the district court denied the plaintiffs' motion and granted summary judgment to the defendants as to the plaintiffs' claims against Avco for breach of contract, estoppel, unjust enrichment, and fraud. The court held that under the express provisions of the supplemental pension agreements Avco was entitled to terminate the pension plans and cease making further pension fund contributions. The court also ruled that the plaintiffs' fraud claim against Avco was preempted by the National Labor Relations Act (NLRA). The court found, however, that genuine issues of material fact existed as to the plaintiffs' remaining claims.

These claims were tried to the court on July 23 and 24, 1984. On December 28, 1984, the court issued its findings of fact and conclusions of law, ruling in favor of the defendants on the remaining claims and entering judgment accordingly. The court held that Avco had properly funded the plans in compliance with the recommendations of the plans' actuary. The court also

concluded that Avco had no fiduciary or contractual obligation to the plaintiffs to give the Bank early notification of the plant closing or to instruct the Bank to segregate the plan assets prior to the time that it did so. Finally, the court determined that the Bank's fiduciary obligation as trustee of the plans did not require it to segregate the plan assets prior to notification of the termination.

Although the present appeal concerns the management and termination of certain employee benefit plans, it is not governed by the provisions of ERISA. In its decision of October 11, 1983, the district court considered whether ERISA preempted the plaintiffs' state law claims. Based on the assumption that the four pension plans at issue all were terminated prior to September 2, 1974, when ERISA was signed into law, the district court concluded that the plaintiffs' state law claims were not preempted. *See* 29 U.S.C. § 1144 (effective January 1, 1975, ERISA preempts state laws relating to employee benefit plans covered by the federal act). While three of the four plans were terminated two days prior to the enactment of ERISA, it is clear from the record that the Guards plan was not terminated until May 31, 1975. The district court incorrectly stated that this latter plan was terminated on May 31, 1974.

The question of the applicability of ERISA to the termination of the Guards pension plan, however, is not raised on appeal. Accordingly, this court will assume without deciding that the plaintiffs' claims as to the termination of this plan are governed by state law.

## III. ISSUES ON APPEAL

Five issues are raised by the plaintiffs' appeal:

(1) Was Avco entitled to terminate the pension plans and cease making pension contributions?

(2) Is the plaintiffs' common law fraud claim preempted by the NLRA?

(3) Did the district court clearly err in finding that Avco made proper cost contributions to the plans in compliance with the recommendations of the plans' actuary?

(4) Did Avco have a contractual or fiduciary duty to notify the Bank, prior to the time that it did so, of the plant closing and plan terminations and to instruct the Bank to segregate the assets allocable to the plans?

(5) Did the Bank have a contractual or fiduciary duty to segregate plan assets prior to receiving notice from Avco of the plan terminations or to advise Avco to notify it at an early date of the plant closing and plan termination?

The issues on appeal, with the exception of the third one, raise questions of law which this court may independently review. *See S.E.C. v. Suter*, 732 F.2d 1294, 1300 (7th Cir.1984). The third issue requires the court to review the district court's findings of fact. These findings are reviewed under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a).

## IV. ANALYSIS

A. Avco's Right to Terminate the Pension Plans

The plaintiffs allege that Avco unlawfully deprived them of their vested pension benefits when it terminated the four pension plans in question and ceased making pension fund contributions. They contend that they were never made aware of any limitation on their vested pension benefits and that they bargained for and were reasonably led to believe by Avco that they would receive these benefits in full.

1. Pension Agreement and Summary Booklet Provisions

Section 9(6) of the Teamsters agreement and section 10(6) of the other three agreements contain the following express cancellation clause:

"Anything contained in this Agreement or in the [Hourly] Plan to the contrary notwithstanding, the Corporation may terminate this Agreement as of any date

on or after which it shall have sold and transferred title to the manufacturing facilities of the Richmond, Indiana plant or on or after which it shall have permanently discontinued manufacturing operations at the said plant by the service of a written notice of such termination upon the Union at least sixty (60) days prior to the date on which such termination shall become effective."

It is undisputed that Avco complied with the 60-day notice provision as to each plan terminated.

Each pension agreement also provides that in the event of the plan's termination upon the shutdown of the Richmond plant, Avco "shall cease to be obligated to make any further contributions to the Pension Fund held by the Trustee to cover the cost of benefits attributable to the service of employees employed at the Corporation's plant in Richmond, Indiana ..." (Teamsters agreement, § 9(8); IBEW, IATC and Guards agreements, § 10(8)). Section 2(3) of each pension agreement states that by the payment of the annual pension contributions, "the Corporation shall be relieved of any further liability and pensions shall be payable only from the Pension Fund."

Thus under the express provisions of the pension agreements, Avco was entitled to terminate the pension plans upon the closing of the Richmond facility and cease making further contributions to the pension fund. Moreover, upon the termination of the plans, the agreements declare that the assets of the fund become the sole source for the future payment of pension benefits.

Confronted with these express provisions of the pension agreements, the plaintiffs point to the description of benefits in the pension plan summary booklets distributed by Avco to the plaintiffs when the plans were adopted. The booklets, entitled "Your Pension Plan," state on page 10 that pension checks shall be received "[a]s long as [the pensioner] live[s] ..." The booklets do not expressly indicate that pension benefits could be terminated under certain circumstances. A letter from Avco's vice-

president prefacing the booklets, however, contains the following qualification:

> "[This booklet] covers only the high points of the [Hourly] Plan and is written with as few legal and technical terms as possible. *It is not intended as a substitute for the full text, and should any questions arise, the Agreement Covering Pensions shall govern.*"

(Emphasis added).

2. Applicable Law

Before addressing the plaintiffs' contentions, it is necessary to clarify what state law is applicable in determining the effect to be given the termination provisions of the pension plans. The district court, without discussion, applied Indiana law to this question. We agree with the plaintiffs that New York law properly governs the question.

■ The forum state's choice-of-law rules determine what substantive law applies to state law claims. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Indiana has long applied what has come to be known as the "most significant relationship" test in deciding what law to apply to a contract dispute. *W.H. Barber Co. v. Hughes*, 223 Md. 570, 63 N.E.2d 417, 423 (1945). This test comes into play, however, only when the parties have not otherwise agreed to the applicable state law. *Utopia Coach Corp. v. Weatherwax*, 177 Md.App. 321, 379 N.E.2d 518, 522 (Ind.Ct. App.1978); *see also Jameson Chemical Co., Ltd. v. Love*, 401 N.E.2d 41, 44 (Ind.Ct. App.1980). An express choice-of-law provision will be given effect in the absence of "exceptional circumstances showing a purpose to commit a fraud on the law." *Paulausky v. Polish Roman Catholic Union of America*, 219 Md. 441, 39 N.E.2d 440, 447 (1942); *see also* 6 I.L.E. Contracts § 2 n. 7 (1958).

■ In the present case, § 12(1) of the Hourly Plan states that its provisions and the provisions of the supplemental pension agreements shall be "construed, regulated and administered" according to New York

law. There are no exceptional circumstances in the present case to render the application of New York law fraudulent or unreasonable. Nor have the parties suggested that the State of Indiana has any public policy interest which outweighs the parties' express choice of law. *See Moll v. South Central Solar Systems, Inc.,* 419 N.E.2d 154, 162 (Ind.Ct.App.1981). Accordingly, New York law will be applied to the plaintiffs' claims regarding the validity of the termination provisions of the pension plans.

3. Validity of Termination Provisions

The plaintiffs assert that because their pension benefits had vested upon their retirement, Avco was barred from ceasing to contribute to the pension fund upon the termination of the pension plans. The defendants concede that the benefits in dispute were vested under the terms of the pension agreements. They contend, however, that the express provisions of the agreements allowing Avco to terminate the agreements without making additional contributions to the pension fund should be given effect.

■■■ Under New York law, the employer's obligations under a pension plan are limited to the terms of the plan and are solely contractual in nature. *Schlansky v. United Merchants & Mfrs., Inc.,* 443 F.Supp. 1054, 1059 (S.D.N.Y.1977); *Gitelson v. DuPont,* 17 N.Y.2d 46, 268 N.Y.S.2d 11, 13, 215 N.E.2d 336, 337 (1966). Thus, where "an employee's right to receive payment under the plan is a conditional contract right and when the plaintiff [becomes] a party to the contract by taking employment under it he [is] bound by these conditions." *Gitelson, supra,* 268 N.Y. S.2d at 13. Moreover, where the provisions of a pension plan are clear and unambiguous they will be strictly construed; the court may not rewrite the terms of the plan. *Alt v. Long Island Railroad Company,* 81 Misc.2d 99, 365 N.Y.S.2d 480, 484 (Sup.Ct.1975), *aff'd,* 54 App.Div.2d 724, 387 N.Y.S.2d 610 (1976); *see also Associated Industries, Etc. v. Murray,* 80 App.Div.2d 648, 436 N.Y.S.2d 106, 108 (1981). We can find no countervailing policy in New York which overrides these basic principles of contract interpretation.

■■■ In the present case, the plaintiffs' right to receive their vested pension benefits was conditioned in clear and unambiguous language on the continued vitality of the pension agreements. Each agreement, by its express terms, permitted Avco to terminate the pension plans upon the shutdown of the Richmond plant and to cease making contributions to the pension fund. Each agreement also provided that pension benefits would be payable only from the pension fund. We agree with the district court that these clear provisions refute the plaintiffs' claim that they are entitled to their full vested benefits notwithstanding the terms of the pension agreements.

Our conclusion is fully supported by the holding of the Third Circuit Court of Appeals in *Boase v. Lee Rubber & Tire Corp.,* 437 F.2d 527 (3d Cir.1970). In *Boase,* the court confronted the same issue we face in the case at bar: whether a termination clause in a pre-ERISA pension plan should be given effect. The pension plan in *Boase* contained a provision allowing the employer to terminate the plan at will. The *Boase* court, applying New York law, held that the termination clause constituted a valid, enforceable contractual condition. The court refused to rewrite the pension plan to contain the provision that the vested benefits of those employees that had completed their employment were unconditionally guaranteed. *Id.* at 532. Similarly, in the present case, we will not rewrite the pension agreements to provide the plaintiffs with an unconditional right to their full, vested pension benefits. We may not alter the express termination provisions in the guise of contract interpretation. *Id.; Alt, supra,* 365 N.Y.S.2d at 484.

The simple fact that the plaintiffs' pension benefits had vested does not mean that these benefits are payable in all events or that they are fully-funded. The Supreme Court, in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 378, 100 S.Ct. 1723, 1734, 64 L.Ed.2d

354 (1980), recognized that the term "vested" in pre-ERISA parlance means that the employee has satisfied the conditions for eligibility, such as age and length of service, not that the pension plan is fully-funded or that payment of the vested benefits is unconditionally guaranteed. Pension benefits may be vested, in other words, "even if the actual realization of expected benefits might depend on the sufficiency of plan assets." *Id.*

· The Court in *Nachman* observed, further, that pre-ERISA pension plans ordinarily contained liability disclaimer provisions similar to those in the Avco pension agreements. *Id.* The Court went so far as to state that because the use of such clauses "unquestionably contributed to the growth of private pension plans, their prohibition would be inconsistent with Congress' repeatedly expressed intent to encourage the maintenance of pension plans." *Id.* at 385 n. 35. One of the major purposes in enacting ERISA was precisely "to prevent the great personal tragedy suffered by employees whose vested benefits are not paid when pension plans are terminated." *Id.* at 374. If disclaimer provisions were unenforceable upon public policy grounds prior to the enactment of ERISA, the need for the statute's plan termination insurance program would have been largely unnecessary.

The plaintiffs cite several cases in support of the proposition that disclaimers of liability in pension plans cannot limit the payment of vested pension benefits. *See Hoefel v. Atlas Tack Corp.*, 581 F.2d 1 (1st Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (applying Massachusetts law); *Hurd v. Hutnik*, 419 F.Supp. 630 (D.N.J.1976) (applying New Jersey law); *Cantor v. Berkshire Life Ins. Co.*, 171 Ohio St. 405, 171 N.E.2d 518 (1960). *See also Delaware Trust Co. v. Delaware Trust Co.*, 43 Del.Ch. 186, 222 A.2d 320 (1966). In *Hoefel*, the court held that the plaintiffs were entitled to full payment of their vested pension benefits despite a termination clause allowing the employer to discontinue the pension plan at any time. The district court in *Hurd* found

that the plaintiffs were owed their full vested pension benefits where the pension agreement was amended following the retirement of the plaintiffs to allow the employer to terminate the pension plan. Finally, in *Cantor*, the Ohio Supreme Court held that an employee is due his vested pension benefits notwithstanding a contractual provision giving the employer the right to terminate the pension plan.

None of the cases discussed by the plaintiffs involved the application of New York law; therefore, they do not control in the present matter. The *Hoefel, Hurd*, and *Cantor* cases, furthermore, are factually distinguishable from this case. In none of these cases, unlike the present case, did the agreements at issue contain clear-cut disclaimer provisions stating that the employer's obligation was limited to contributing to the pension fund only during the term of the agreements and that benefits were payable only from the money held in the pension funds. In fact, the court in *Hurd, supra*, 419 F.Supp. at 655, expressly recognized that:

> "... nothing prevents employers from specifically limiting their liability under a multi-employer plan to the specific contributions to be made by them on a per-hour basis for the life of each collective bargaining agreement, provided that this limitation is the express intention and understanding of the parties."

The Avco pension agreements contained just such limitation provisions bargained for at arm's length by the four collective bargaining units representing the plaintiffs. In *Hurd*, by way of contrast, the termination provision was added to the collectively bargained agreement after the plaintiffs had retired, when they were no longer union members, and thus were unrepresented at the negotiations for the agreement. *Id.* at 645.

We also note that the relevant contractual provisions in both *Cantor* and *Hoefel* allowed the employer to terminate the plaintiffs' pension rights at will. *Hoefel, supra*, 581 F.2d at 3; *Cantor, supra*, 171

N.E.2d at 337. Under the Avco pension agreements, in contrast, termination was permissible only if Avco sold or shutdown the Richmond facility.

Even if we accept the premise that public policy requires that pension plans be construed, where possible, to avoid the denial of vested benefits, *see Hoefel, supra,* 581 F.2d at 6, we cannot ignore the plain termination provisions of the Avco pension agreements. The plaintiffs, through their respective union locals, agreed to these provisions and are now bound by them.

#### · 4. Promissory Estoppel

The plaintiffs argue that Avco should be estopped from enforcing the termination provisions of the pension agreements because of the company's statement in the plan summary booklets that pension checks will be received for "as long as [the plan participant] live[s]...." The plaintiffs also contend that each of them relied on documents provided by Avco upon retirement showing the benefits he or she would receive. The summary booklets by their express terms, however, do not purport to set forth the complete provisions of the plans. The booklets warn the employees to consult the pension agreements in the event of any questions concerning benefits.

■ To sustain a claim for promissory estoppel, the plaintiff must establish (1) a clear and unambiguous promise by the defendant-promisor; (2) which induced reasonable and foreseeable reliance by the plaintiff-promisee; and (3) which resulted in injury to the plaintiff. *Ripple's of Clearview v. LaHavre Associates,* 88 App. Div.2d 120, 452 N.Y.S.2d 447, 449 (1982); *see also* Restatement (Second) of Contracts § 90 (1981). The plaintiffs' asserted reliance on the summary booklets is neither reasonable nor foreseeable in light of the express admonition prefacing each of the booklets. Thus, we conclude that the plaintiffs cannot avail themselves of the doctrine of promissory estoppel.

■ We agree with the courts in *Anthony v. Ryder Truck Lines, Inc.,* 466 F.Supp.

1287, 1292–94 (E.D.Pa.), *rev'd on other grounds,* 611 F.2d 944 (3d Cir.1979), and *Churchwell v. Firestone Industrial Products Co.,* 431 N.E.2d 853, 855 (Ind.Ct.App. 1982), that when the summary booklet expressly states that it is merely an outline of the pension plan and that the formal text of the plan governs in the event a question arises, the plaintiffs cannot rely on the general statements of the booklet but must look to the plan itself. *See also Van Orman v. American Ins. Co.,* 680 F.2d 301, 307 (3d Cir.1982); *Voight v. South Side Laundry & Dry Cleaners, Inc.,* 24 Wis.2d 114, 118, 128 N.W.2d 411 (1964).

■ The cases the plaintiffs cite in support of their estoppel argument are distinguishable from the present case. In those cases, the booklets failed to inform employees that they were intended only to summarize pension benefits and that the plans themselves were still controlling. *Hoefel, supra,* 581 F.2d at 3; *Hurd, supra,* 419 F.Supp. at 640; *Gould v. Continental Coffee Co.,* 304 F.Supp. 1 (S.D.N.Y.1969); *Davilla v. Court Employment Project, Inc.,* 86 Misc.2d 552, 383 N.Y.S.2d 140 (Civ.Ct. 1976). Even in *Hurd,* the disclaimer in the summary booklet did not clearly inform the employees that the plan itself was controlling. It simply provided that the summary "'is intended to highlight the main provisions of the Plan. For detailed information concerning any specific problem you should contact either the Union or Fund Office.'" *Hurd, supra,* 419 F.Supp. at 640. Moreover, the court in *Hurd* did not expressly consider the effect of this provision in its discussion of estoppel. *Id.* at 656–57.

The court also notes that in contrast to the case at hand, the employer in *Hoefel, supra,* 581 F.2d at 3–4, when faced with employee expressed concern, actively misrepresented to employees that a change in the structure of the pension plan had strengthened the plan when, in fact, the change was necessitated by the employer's economic losses and did not make the plan more reliable. (Although the court in *Hoefel* based its holding on the plaintiffs' contractual claim and thus found it unneces-

sary to rule on their promissory estoppel claim, the court did discuss the plaintiffs' reliance on representations made to them by their employer.)

Furthermore, the employer in *Hoefel*, while reserving the right to discontinue the plan, never expressly informed its employees that termination of the plan could cut off payment of vested benefits. *Id.* at 3, 6. The employer, in fact, told its employees just the opposite in the plan summary booklet, informing them that " '[n]o change, suspension, or discontinuance [of the pension plan] will adversely affect the pensions already purchased....' " *Id.; see also Winston v. Trustees of Hotel and Restaurant Employees and Bartenders Int'l Union Welfare Fund*, 110 Ill.App.3d 163, 65 Ill.Dec. 703, 441 N.E.2d 1217 (1982). The Avco pension agreements, on the other hand, expressly provided that upon plan termination, the company had no further obligation to make contributions to the pension fund, from which pensions solely were payable. Nor did the plan summary booklets distributed by Avco indicate to employees that they would receive their vested benefits even if the respective pension plans were terminated. The Avco booklets simply did not address the issue of plan termination and its impact on pension benefits.

### 5. Unjust Enrichment and Unconscionability

The plaintiffs next contend that Avco has been unjustly enriched by its failure to pay the plaintiffs their full, vested pension benefits, and that Avco's termination of the plans without fully funding the vested benefits was unconscionable, against public policy and without consideration.

In order to recover for unjust enrichment under New York law, the plaintiff must show that the defendant was enriched at the expense of the plaintiff under circumstances requiring that in equity and good conscience the defendant should make restitution. *Strapex Corp. v. Metaverpa N.V.*, 607 F.Supp. 1047, 1051 (S.D.N.Y.1985); *Schuler-Haas Electric*

*Corp. v. Wager Constr. Corp.*, 57 App. Div.2d 707, 395 N.Y.S.2d 272, 274 (1977). The doctrine of unjust enrichment is recognized at law only in the absence of an agreement between the parties. *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643, 644–45 (1970). Thus, enrichment is not unjust where it is permissible under the terms of a pension agreement. *See Craig v. Bemis*, 517 F.2d 677, 684 (5th Cir.1975).

Here, Avco and the collective bargaining units representing the plaintiffs agreed to the termination provisions in the pension agreements. The agreements provided in plain terms that the company's obligation to make contributions to the pension fund ceased upon the termination of the respective plans. This case, therefore, is distinguishable from *Lucas v. Seagrave Corp.*, 277 F.Supp. 338, 345–46 (D.Minn. 1967), in which the court held that the plaintiffs' unjust enrichment claim for accrued pension benefits presented a triable issue of fact whether a clause in the pension plan contract providing for the forfeiture of unvested pension benefits when an employee is terminated applies to the contingency of the termination of a large group of employees. Accordingly, the doctrine of unjust enrichment is not applicable to the instant case.

Nor have the plaintiffs made any showing to support a finding of unconscionability. The basic test of unconscionability is whether, in view of the general commercial setting and the circumstances existing at the time of entering into the contract, the clauses at issue are so one-sided as to be oppressive and unfair to the plaintiff. *State v. Avco Financial Service of New York, Inc.*, 50 N.Y.2d 383, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075, 1078, (1980) (quoting U.C.C. § 2–302, Official Comment 1 (1976)). While the doctrine is intended to prevent oppression and unfair surprise, it is not designed to upset the allocation of risks due to superior bargaining power. *Id.* An unconscionable contract is characterized by the absence of

meaningful choice by one of the contracting parties and by contract terms which are unreasonably favorable to the other party. *Id.*

 The plaintiffs herein have presented no evidence that their union bargaining representatives were duped into consenting to the termination provisions in the pension agreements or that they had no choice but to accept these provisions. Nor is there any evidence that Avco employed high pressure tactics in negotiating the terms of the pension agreements or that the agreements solely benefited the company. *See Industrialease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.*, 58 App.Div.2d 482, 396 N.Y.S.2d 427, 431 n. 4 (1977); *Miner v. Walden*, 101 Misc.2d 814, 422 N.Y.S.2d 335, 338 (1979). In sum, there are no facts in the record to support the plaintiffs' claim of unconscionability.

### 6. Welfare and Pension Plans Disclosure Act

The plaintiffs assert that Avco failed to comply with the Welfare and Pension Plans Disclosure Act (WPPDA), 29 U.S.C. §§ 301–309, by not explaining the plan termination provisions to them. The WPPDA was repealed by section 111 of ERISA, 29 U.S.C. § 1031, and replaced by ERISA's stronger disclosure provisions, 29 U.S.C. §§ 1021–1031, effective January 1, 1975. (Section 1031(b)(2), 29 U.S.C., allows the Department of Labor to set an effective date later than January 1, 1975, under certain circumstances.) ERISA's disclosure provisions are not at issue in this case.

 The WPPDA required the pension plan administrator to publish a description of the plan for plan participants and beneficiaries and for the Secretary of Labor. 29 U.S.C. § 304(a). Whereas under ERISA's disclosure provisions the plan summary must describe the circumstances which may result in ineligibility for or denial of benefits, 29 U.S.C. § 1022(b), neither the WPPDA nor its regulations contained such a requirement. In approving ERISA's more stringent disclosure requirements, the House Committee on Education and Labor recognized that one of the major changes under the new law is that, unlike the WPPDA, it mandates disclosure of circumstances under which benefits may be terminated. H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4648–49 (1974). The WPPDA, thus, did not require Avco to explain in its summary booklets the termination provisions in the pension agreements.

 Moreover, even had Avco violated the WPPDA, the statutory enforcement scheme severely limits the remedies available to a plan participant. 29 U.S.C. § 308(b) and (c). Under these provisions, if the plan administrator fails or refuses to supply a copy of the plan description to a participant or beneficiary upon written request, that party may bring a civil action against the administrator and the court, in its discretion, may award $50.00 per day to the plaintiff, plus a reasonable attorney's fees, beginning with the date of such failure or refusal. The WPPDA does not authorize a claim for pension benefits, as made by the plaintiff herein. *See Lamb v. Connecticut Gen. Life Ins. Co.*, 509 F.Supp. 560, 564 (D.N.J.1980), *aff'd*, 643 F.2d 108 (3d Cir.), *cert. denied*, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed. 2d 116 (1981); *Moyer v. Kirkpatrick*, 265 F.Supp. 348, 350 (E.D.Pa.1967), *aff'd*, 387 F.2d 955 (3d Cir. 1968). The WPPDA, therefore, does not support the plaintiffs' claim for lost pension benefits.

### B. Preemption of the Fraud Claim

The plaintiffs' complaint charges that at the time of negotiating and entering into the collective bargaining agreements and the pension agreements in effect when the Richmond plant closed, Avco knew that the plant would have to close and acted fraudulently by misrepresenting and failing to disclose facts relevant to the plant closing during the negotiations. The district court held that the plaintiffs' state law fraud claim was preempted by the NLRA.

The fraudulent conduct charged by the plaintiffs constitutes an unfair labor practice under § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), which prohibits an employer from refusing to bargain in good faith with the representatives of its employees. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *NLRB v. Custom Excavating, Inc.*, 575 F.2d 102, 106 (7th Cir.1978). A state law claim presumptively is preempted where the unlawful activity charged actually or arguably constitutes an unfair labor practice under the NLRA. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).

Exceptions to the NLRA preemption doctrine are recognized where the activity to be regulated is of only "peripheral concern" under the Act or "touches interests deeply rooted in local feeling and responsibility." *Id.* at 243–44, 79 S.Ct. at 779. In determining whether these exceptions apply to a given case, the state's interest in remedying the effects of the challenged conduct must be balanced against both the interference with the National Labor Relations Board's (NLRB) ability to adjudicate the controversy and the risk that the state will approve conduct that the NLRA prohibits. *Belknap, Inc. v. Hale*, 463 U.S. 491, 498–99, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983).

The fraudulent conduct alleged by the plaintiffs clearly is of far more than "peripheral concern" under the NLRA. Insuring that employers and employees bargain with each other in good faith is of central importance under the Act. *See H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970); *Truiff Mfg., supra*, 351 U.S. at 153–54, 76 S.Ct. at 756.

Nor does the state's interest in redressing the alleged fraud by Avco overcome the general rule of preemption in this case. While the forum state undoubtedly has an interest in protecting its citizens from fraudulent misrepresentations, whether in labor negotiations or not, that interest is outweighed here by the NLRB's strong interest in adjudicating this controversy and the danger that the resolution of the dispute under state law and under the NLRA might differ.

Of critical importance in considering the preemptive effect of the NLRA is whether the controversy presented by the state claim is identical to that which could have been presented to the NLRB. *Belknap, supra*, 463 U.S. at 510, 103 S.Ct. at 3183; *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978). It is only in this situation that litigation of a state claim necessarily involves a risk of interference with the unfair labor practice jurisdiction of the NLRB. *Id.*

The plaintiffs' common law fraud claim against Avco is indistinguishable from an unfair labor practice claim that could have been pursued before the NLRB. In both cases, the key inquiry would be whether, at the time of negotiating and entering into the final collective bargaining and pension agreements, Avco had knowledge of facts indicating that the Richmond plant would have to close but withheld this information from the plaintiffs' union representatives. One of the local bargaining units, the IATC, actually presented an essentially identical claim of fraud to the NLRB in May 1984, only to withdraw it less than one month later.

The plaintiffs also suggest that the NLRA preemption doctrine is inapplicable where the state remedy sought is different in kind from the remedy available under the NLRA. Initially, we note that the plaintiffs have made no showing that the damage remedy for lost pension benefits that they seek under their fraud claim is outside the scope of the NLRB's remedial power. Even had they done so, however, their contention still would fail.

In *Garmon, supra*, 359 U.S. at 246–47, 79 S.Ct. at 780, the Supreme Court rejected the contention that the rule of preemption is inapplicable simply because the damage

remedy available in state court is outside the scope of the NLRB's remedial powers. In reaching its holding, the Court observed that the rule of preemption is designed to prevent "conflict in its broadest sense; conflict with a complex and interrelated scheme of law, remedy, and administration." *Id.* at 243, 79 S.Ct. at 778. Therefore, "since remedies form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy ... which has been withheld from the National Labor Relations Board only accentuates the danger of conflict" between state and federal regulation. *Id.* at 247, 79 S.Ct. at 781.

If there was ever any doubt as to the vitality of the *Garmon* holding, it was laid to rest by the Supreme Court's recent decision in *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, — U.S. ——, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). In *Gould,* the Court held that the NLRA preempted a Wisconsin statute which barred certain repeat violators of the federal Act from doing business with the state. Quoting liberally from *Garmon,* the Court in *Gould* stated that "the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Id.* at 1061.

*Belknap,* contrary to the plaintiffs' contention, does not stand for the opposite. The Court in *Belknap* did not find the preemption rule inapplicable based on a difference between available state and NLRB remedies. Instead, the Court in that case held that the state claim at issue was not preempted under *Garmon* because it presented a different controversy than the claim which could have been brought before the NLRB. *Belknap, supra,* 463 U.S. at 510–12, 103 S.Ct. at 3183–84. Accordingly, we conclude that the plaintiffs' fraud claim against Avco is preempted by the NLRA.

## C. Adequate Funding of the Pension Plans

The plaintiffs claim that the four pension plans at issue in this case were not adequately funded, and that they were not funded according to the instructions and recommendations of the actuary of the plans. Following the trial of this issue, the court made detailed factual findings and concluded that the plans were properly funded by Avco.

Under the provisions of the pension plans, Avco made so-called "normal contributions" to the pension fund only for active employees: those employees on active service within the given year for which contributions were being made. Thus, Avco had no obligation to make normal contributions to the pension fund on behalf of an employee for any time period during which that employee performed no compensable work. Avco also made "past service contributions" to the pension fund, representing the actuarial value of the projected benefits attributable to prior service accrued before the inception of the given plan as well as payments to cover pension benefit increases for covered employees. The plaintiffs challenge the computation and funding of only the normal contributions, not the past service contributions.

Avco, pursuant to the terms of the pension agreements, made its pension contributions consistent with the recommendations of an independent actuary appointed by the company. During the existence of the four pension plans in dispute, George B. Swick, the appointed actuary, furnished the company with an annual report establishing, *inter alia,* the normal contribution rate to cover the current service to be accrued by employees during the coming year. Avco, in keeping with the methodology used by the actuary, made quarterly normal contributions to the pension fund for each of the four bargaining units by multiplying the monthly normal contribution rate by the number of active employees on the company's payroll, during each month of the quarter.

Avco made pension fund contributions based only on the number of employees then active, even though the normal contribution rate was calculated on the basis of all covered employees: active employees plus those employees, subject to recall, who had been on layoff status less than two years. This discrepancy, according to the plaintiffs, resulted in underfunding of the pension plans based on general actuarial principles and was contrary to the recommendations of the plans' actuary.

The validity of the plaintiffs' underfunding claim turns on the rather limited question of the manner in which the normal contribution rate was calculated. The plaintiffs contend that this calculation was made according to what Mr. Swick termed the attained age method. The plaintiffs' actuarial expert, Daryl Dean, designated this formula as the aggregate method. The important point is not the label assigned to this method but its effect on the calculation of normal contributions. The district court, consistent with the testimony of Mr. Swick, found, however, that the so-called entry age method was used in calculating the normal contributions to the pension fund.

The district court's findings of fact, whether based on oral or documentary evidence, may not be set aside unless they are clearly erroneous. Fed.R.Civ.P. 52(a). This highly deferential standard is particularly important where the findings are based primarily upon the credibility of the witnesses. *Soto v. Dickey*, 744 F.2d 1260, 1263 (7th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985). To overturn the lower court's factual findings, we must be left with the definite and firm conviction, after examining the evidence, that a mistake has been made. *Id.* Our role on review is not to sit as a trier of fact to reweigh the evidence. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Under the attained age method, the normal contribution rate is calculated based on the spread from the present age of plan participants, taken in aggregate, at the date of valuation to the assumed time that they will retire or drop out of the given pension plan. Using this methodology, the inclusion of laid-off workers in the calculation of the normal contribution rate would tend to lower the rate. This result flows from the fact that workers laid off are generally younger than those in active service. Therefore, using an attained age calculation, normal contributions would be lower, on average, if laid-off workers were included in the calculation of the rate of contribution than if the valuation group included only active workers.

In contrast to the attained age method, the entry age method is based on the average time from entry in the Avco workforce to retirement for employees in the valuation group. The present value of the projected benefits for each employee included in the valuation group is spread on a level basis over this average time period. According to the undisputed testimony of Mr. Swick, under the entry age method it is immaterial whether the valuation group includes laid-off employees or only active employees because the average time between entry and retirement is not significantly different for these two groups. Mr. Swick testified, without challenge, that laid-off employees were included in the valuation group for calculating the normal contribution rate in order to provide for the unfunded prior service cost to both active and laid-off employees.

The plaintiffs' expert witness, Mr. Dean, considered Avco's normal contributions to be inadequate because the company included laid-off workers in the valuation group for calculating the disputed rate but made normal contributions only for active employees. Mr. Dean specifically conditioned his testimony on his belief that Avco had used the attained age method—what he referred to as the aggregate method—in determining the normal contribution rate.

At the same time, Mr. Dean acknowledged that the entry age method provided an actuarially acceptable means for calculating normal contributions for hourly pension plans such as Avco's plans. Moreover,

in his cross-examination Mr. Dean agreed with Mr. Swick that, on an aggregate basis, laid-off and active workers generally will have entered into the employment relationship at the same time.

The district court simply chose to believe Mr. Swick's testimony that he used the entry age method to calculate the normal contribution rate. The district court's finding to this effect is not clearly erroneous.

Each annual report prepared by Mr. Swick contained a section entitled "Valuation Methods." Although no method is actually defined in each of the first eleven annual reports, commencing with the twelfth report and in all successive reports, the valuation method is designated as the "[p]rojected benefit method with aggregate level normal cost and frozen supplemental liability." Mr. Dean interpreted this phrase to mean that the rate was calculated based on the average period of time for employees in the valuation group between their present age at the date of valuation and their age at retirement, what Mr. Swick referred to as the attained age method, rather than the average period of time from an employee's age of entry in the workforce to his or her retirement, the period used under the entry age method.

Mr. Dean did not explain on what basis he made his assumption about the meaning of the contested phrase. Nor did he testify that the phrase had any established meaning in actuarial parlance. In short, the plaintiffs offered no evidence to show that the phrase necessarily is inconsistent with the actuary's contention and the district court's finding that the entry age method was used in calculating the normal contribution rate.

Mr. Swick for his part, testified that (1) the term "projected benefits" in the disputed phrase meant simply that the actuary was projecting future benefits; (2) the reference to "aggregate level normal cost" was inserted to indicate that the calculation was not made for individual employees but was made on an aggregate basis for all employees; and (3) the term "frozen supplemental liability" was used to denote that

there was a past service obligation. The plaintiffs did not contest this explanation at trial nor have they done so on appeal.

Instead, they suggest that Mr. Swick's testimony is not worthy of credence because his fees were paid by Avco and because he assisted the company in collective bargaining negotiations and in preparing for the termination of the pension plans at issue herein. The assessment of Mr. Swick's credibility is best left to the trial judge who, unlike us, had the opportunity to view the live testimony of the witnesses and consider their demeanor. In *Anderson, supra,* 105 S.Ct. at 1512, the Court said:

"... when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."

■ The record in this case provides a more than adequate basis for the district court's finding that the plans' actuary used the entry age method in calculating the normal contribution rate. The trial court believed Mr. Swick's explanation that he used the entry age method in calculating the normal contribution. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* Accordingly, we affirm the district court's denial of the plaintiffs' underfunding claim.

### D. Avco's Duty to Notify the Bank

The plaintiffs claim that Avco breached its fiduciary and contractual duty to them by failing to notify the Bank not later than January 1974 of the projected Richmond plant closing and the termination of the pension plans in dispute. The plaintiffs theorize that if the Bank had known in January 1974 of the company's plans, as a responsible trustee it would have segregated the plan assets and placed them in low-risk, short-term money market funds to protect them from the exposure and risk of

market fluctuations. As it happened, the plan assets declined substantially in value during a falling market in the months immediately preceding the termination of the four plans.

Although in January 1974 Avco publicly announced its decision to close the Richmond plant, the closing date of August 31, 1974, was not set until May 1974. On August 31, 1974, Avco gave the Bank notice of the plant closing along with instructions to segregate the assets allocable to the IATC, Teamsters, and IBEW plans when these plans terminated on August 31, 1974. A similar notice was sent to the Bank on May 1, 1975, with instructions to segregate the assets allocable to the Guards pension plan when it terminated on May 31, 1975. Pursuant to Avco's instructions, the Bank segregated the assets allocable to the four pension plans and invested the assets in short-term, interest-bearing funds. The plaintiffs do not contest these facts, which are detailed in the district court's findings.

The district court concluded Avco's duties to the plaintiffs were exclusively contractual and that the company had no fiduciary duty regarding the Bank's investment of the pension contributions. In addition, the trial court concluded that Avco had no fiduciary or contractual responsibility to notify the Bank of the Richmond plant shutdown or to instruct the Bank to segregate the assets allocable to the four pension plans prior to the time that it did so in August 1974. The plaintiffs challenge these conclusions of law. They are unable, however, to cite any case law or pension agreement provisions to support their position.

As previously discussed, under New York law an employer's obligations under a pension plan are solely contractual, and, thus, are limited by the terms of the plan. *Schlansky, supra,* 443 F.Supp. at 1059 (and cases cited therein); *see also Lehner v. Crane Co.,* 448 F.Supp. 1127, 1131 (E.D. Pa.1978); *Hurd v. Illinois Bell Tel. Co.,* 136 F.Supp. 125, 135 (N.D.Ill.1955), *aff'd,*

234 F.2d 942 (7th Cir.), *cert. denied,* 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956).

The plaintiffs cite the statements of Eduardo Aguirre, a bank trust officer who testified on their behalf, that he reasonably would expect the corporate sponsor of a pension plan to notify the trustee of any situation in the company that might affect the pension plan, such as a plant closing or plan termination. This testimony, however, does not support the proposition that Avco was under a contractual duty to notify the Bank as soon as it knew of the Richmond plant closing and plan terminations. Whether it would have been reasonable for Avco to so notify the Bank is not at issue in this case.

■■■ The terms of the Avco Hourly Plan vest sole responsibility in the trustee for investment of the pension contributions. There are no plan provisions to imply that it was Avco's duty to notify the Bank as trustee of the plant closing and plan terminations immediately when these facts became known to the company. Section 10 of the Hourly Plan does allow Avco to direct the trustee to segregate assets allocable to a particular class of employees or plan beneficiaries. By its express terms, however, this section is voluntary, not mandatory. We hold, therefore, that Avco did not violate any contractual or fiduciary duty to the plaintiffs by failing to notify the Bank prior to August 23, 1974, of the Richmond plant closing and pension plan terminations.

E. The Bank's Management of the Pension Fund

The plaintiffs' final claim is that the Bank violated fiduciary and contractual obligations owed them to segregate the assets allocable to the four pension plans at an "early date" and to advise Avco to provide it with notice at an "early date" of the Richmond plant closing and the plan terminations. The plaintiffs have not specified what they mean by an "early date," other than to argue that the Bank should have acted "well prior to August 31, 1974." The district court concluded as a matter of law

that the Bank's fiduciary obligation as trustee of the pension plans did not require that it segregate the plan assets prior to receiving notification of the plan terminations, and that the Bank acted "reasonably and in good faith" in response to such notification by segregating the pension assets and investing them in short-term funds.

■■■ The plaintiffs' claim against the Bank is predicated on the application of the prudent investor rule to the Bank's management of the pension fund. This rule, generally applicable in New York, requires the trustee to use such diligence and care in the management of the fund as a person of ordinary prudence would exercise in managing his own affairs. *In re Bank of New York*, 35 N.Y.2d 512, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700, 703 (1974); *In re Clark*, 257 N.Y. 132, 137, 177 N.E. 397 (1931); N.Y. Est. Powers & Trusts Law § 11–2.2 (McKinney 1967).

Section 4 of the Third Amended Trust Agreement applicable to the four pension plans, however, contained an exculpatory clause relieving the trustee of liability for any loss to or diminishment of the pension fund assets except insofar as such loss was due to "its own willful misconduct or lack of good faith." The Trust Agreement also provided that it be construed and enforced under New York law. The plaintiffs argue that this clause should be held invalid to the extent that it excused the Bank from exercising reasonable care in the management of the pension assets.

Under New York law, exculpatory provisions like the one in the present case are valid in inter vivos trusts. *See Stark v. United States Trust Co. of New York*, 445 F.Supp. 670, 683 (S.D.N.Y.1978); *In re Cowles' Will*, 22 App.Div.2d 365, 255 N.Y. S.2d 160, 174 (1965), *aff'd*, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966).

To support their position, the plaintiffs cite § 11–1.7, New York Estate Powers & Trust Law, which prohibits exculpatory provisions in testamentary trusts on public policy grounds. By its express terms, this section is only applicable to testamentary trusts. Moreover, the identical predecessor to § 11–1.7 was held inapplicable to inter vivos trusts, as involved in the present case. *In re Sherman's Estate*, 141 N.Y. S.2d 789, 792 (Sur.Ct.1955); *In re Central Hanover Bank & Trust Co.*, 176 Misc. 183, 26 N.Y.S.2d 924, 926–27 (Sup.Ct.), *aff'd*, 263 App.Div. 801, 32 N.Y.S.2d 128 (1941), *aff'd*, 288 N.Y. 608, 42 N.E.2d 610 (1942); *see also City Bank Farmers Trust Co. v. Bennett*, 159 Misc. 779, 287 N.Y.S. 784 (Sup.Ct.1936); *Gould v. Gould*, 126 Misc. 54, 213 N.Y.S. 286 (Sup.Ct.1925) (prior to the enactment of the predecessor to § 11–1.7, exculpatory clauses of the type involved in the present case were considered valid). Thus, the exculpatory clause in the Trust Agreement is valid and applicable to this case.

■■■ Applying the clause to the claim against the Bank, there is no evidence, nor do the plaintiffs assert, that the Bank's failure to segregate the pension assets and to request notification of the plant shutdown and plan terminations at an "early date" was due to any willful misconduct or bad faith on the part of the Bank. Nor is there any evidence that the Bank knew that the plan terminations were impending prior to receiving notice from Avco or that it otherwise did not act in good faith in managing the pension fund. We find, therefore, that the Bank did not violate its contractual or fiduciary duties to the plaintiffs in the management of the pension fund.

For the foregoing reasons, the judgment of the district court is affirmed.